# IN THE SUPREME COURT OF IOWA

No. 12–0292

Filed August 23, 2013

**PHILLIP E. JONES,**

Appellant,

vs.

**UNIVERSITY OF IOWA; THE BOARD OF REGENTS FOR THE STATE OF IOWA; SALLY MASON,** President of the University of Iowa and Individually; and

**THE STOLAR PARTNERSHIP, LLP,**

Appellees.

---

Appeal from the Iowa District Court for Johnson County, Fae E. Hoover-Grinde, Judge.

Former employee appeals from the district court's denial of his motion to compel discovery and the district court's grant of summary judgment in favor of the defendants on his claims of wrongful termination of employment and related causes of action. **AFFIRMED.**

David J. Dutton, Cheryl L. Weber, and Erin Patrick Lyons of Dutton, Braun, Staack & Hellman, P.L.C., Waterloo, for appellant.

Thomas J. Miller, Attorney General, and Jeffrey C. Peterzalek and Jordan G. Esbrook, Assistant Attorneys General, for appellees University of Iowa, The Board of Regents for the State of Iowa, and Sally Mason.

Gregory M. Lederer and Megan R. Dimitt of Lederer Weston Craig PLC, Cedar Rapids, for appellee Stolar Partnership, LLP.

**ZAGER, Justice**.

Phillip E. Jones, dean of students and vice president of student services at the University of Iowa, was terminated from his employment by University of Iowa President Sally Mason. This employment decision was based partially on a report from the Stolar Partnership (Stolar), a law firm retained by the Board of Regents for the State of Iowa (Regents), to investigate the University's response to a sexual assault of a student–athlete by other student athletes.

Jones sued the University of Iowa, Mason, the Regents, and Stolar for wrongful termination and related causes of action. The district court granted summary judgment to all the defendants on all claims. Jones appealed, and we retained the appeal.

Jones asserts the district court committed error when it denied his motion to compel discovery of hundreds of communications, which the defendants claimed were privileged. Jones also claims the district court erred when it concluded the attorney general's certification that Mason acted within the scope of her employment was conclusive on this issue. Finally, Jones contends the district court erred when it granted summary judgment to all of the defendants on his various claims. For the reasons set forth below, we affirm the rulings of the district court.

## I. Background Facts and Proceedings.[1]

On September 23, 2008, Jones was terminated from his employment as dean of students and vice president of student services at the University of Iowa. Jones had been dean of students since about 1981. He did not have a written contract of employment with the

---

[1]Because we are reviewing the district court's grant of summary judgment, we set forth the facts in the light most favorable to Jones, the nonmoving party. *Rivera v. Woodward Res. Ctr.*, 830 N.W.2d 724, 727 (Iowa 2013).

University, and the parties agree that he was an at-will employee. Jones reported directly to Mason, president of the University. In his position as dean of students, Jones oversaw a comprehensive array of University student services, including residence life, the Iowa Memorial Union, disciplinary processes, student government, and numerous other departments and functions of the University. He was the administrator of the Code of Student Life and related policies and regulations governing students. Mason terminated Jones's employment after reviewing a report prepared by Stolar, which was critical of Jones's handling of an alleged October 2007 sexual assault of a female student–athlete perpetrated on her by two members of the University football team. The assault occurred at a University dormitory in the early morning hours of October 14, 2007.[2]

On the morning of October 15, Fred Mims, associate athletic director for student services, advised Jones's office by telephone of the alleged sexual assault. Mims had been contacted by the head coaches of both the victim and the perpetrators, and had discussed the incident with Gary Barta, the University's athletic director. Jones learned directly of the incident later that day when Steve Parrott, director of university relations, advised him and Marcus Mills, general counsel for the University, of "an incident or . . . a sexual assault in a residence hall" that had occurred over the weekend. Jones did not take any action as a result of this information. During the next several days, the department of athletics (DOA) commenced an informal investigation into the incident. DOA met with the victim and her father, the alleged perpetrators, and otherwise attempted to handle the incident on an informal basis. This

---

[2]One of the football players was ultimately convicted of assault with intent to commit serious injury, the other of simple assault.

was purportedly pursuant to the direction of the victim and her father. This informal investigation also involved many additional members of the university community.

Jones discussed the incident with Mims on October 18 and 19. By that time, the football players had been suspended from the football team. In their discussions, Jones expressed concern about "double jeopardy" in further action involving the football players. Mims explained the alleged perpetrators had been suspended for team rule infractions for withholding information from the team coach, not due to the allegations of sexual assault which were governed by the Code of Student Life. It was determined the alleged perpetrators should be informed of the possibility of further action in writing.

On October 19, Mims again contacted Jones to discuss the incident and how Jones's office planned to proceed. Jones expressed concern about the handling of the investigation and stated that the incident should be reported to the Office of Equal Opportunity and Diversity (EOD)—the University's administrative department designated to investigate complaints of sexual assault. At the conclusion of this conversation, Jones discussed the situation with his associate dean, Tom Baker. Jones's assessment was, "[W]ell, let's see if we get a complaint. When we get a complaint, then we can do something. Otherwise, all these rumors, we can't do very much with them."

On October 23, DOA decided that all notes and investigative interviews gathered as part of its informal investigation should be finalized and a report turned over to the office of EOD, the office of student affairs, and the general counsel. Jones received his copy of the report late that morning or early afternoon. Jones scanned through the documents, but because it did not contain a formal, signed complaint, he

elected to place the report in a general disciplinary file. Jones did not call EOD, contact Mims, contact the victim, or take any other action at that time.

As a result of the DOA report, the EOD commenced a formal investigation. While this formal investigation was proceeding, the victim and her parents contacted several university officials in an attempt to obtain information regarding the status of the investigation. During this time, the victim was subjected to continued harassment and retaliation from members of the football team, as well as other student–athletes. This included physical threats and verbal insults in the dormitory dining area in the building where the assault allegedly occurred, and where she still resided.

Due to the continued harassment, and general dissatisfaction with the University's response to the incident, the victim filed a criminal complaint with the University Department of Public Safety on November 5. She also reported the assault to the Johnson County Attorney, who charged and prosecuted the two football players. Around this time the victim first learned of the second perpetrator who allegedly assaulted her while she was unconscious. Upon learning of his identity, she realized this individual was living down the hall from her.

On November 13, at the direction of Mills, the victim's mother contacted Jones to discuss the continuing harassment and the victim's housing situation. During this conversation, Jones indicated to the victim's mother that he "had nothing" on the incident, and he did not know who she (the mother) was. Jones also indicated that without a complaint, specific information, or credible allegations sent to his office, he was unable to take action.

On November 15, EOD completed a formal written report of its findings pursuant to its investigation.[3]  The next day, Jones met with Chuck Green, director of public safety for the University, as well as the victim, the victim's mother, and a rape victim advocate.  At that meeting, the victim requested that she be released from her housing contract, a request which Jones granted.  The victim also provided Jones with the names of several student–athletes who she claimed had subjected her to harassment.  Jones subsequently sent letters to those individuals notifying them of the University's anti-retaliation policy.  However, the letters did not inform these individuals that they had already been accused of conduct in violation of the Code of Student Life.  Jones did not initiate any in-person contact with these individuals.  He had no additional contact with the victim or her family and did not take any other action with respect to the alleged assault.

Also on November 16, the Regents asked their general counsel, Tom Evans, and their acting executive director, Andrew Baumert, to conduct an investigation into the University's compliance with University policies and procedures in responding to the sexual assault complaint. While this investigation was occurring, the victim's parents wrote two letters to various University officials sharply critical of the University's handling of the incident.  The first letter was written on November 19, 2007, and the second letter was written on May 16, 2008.  The second letter stated, in part:

> My purpose in writing is to address the failings of your system and the effects those failures have had on [the

---

[3]This report was not disseminated to anyone at this time because on November 14, 2007, the Johnson County Attorney obtained an order to issue a subpoena duces tecum to the EOD.  The order also instructed the EOD not to divulge any information contained in the materials released pursuant to the subpoena or any information about the investigation itself.

victim]. . . . I include Dean Jones because he told [the victim] and me in person that [the victim] would be protected by him and his office for the duration of the year. That did not happen. [The victim] was taunted, heckled, harassed for the entire school year. . . .

Jones received both letters, read them line by line, and placed them in a general file without taking any additional action. No one within the University turned these letters over to the Regents.

After Evans and Baumert's investigation, a report was submitted to the Regents on June 11, 2008. Evans and Baumert concluded:

> After a comprehensive review of the facts of the alleged incident and each of the applicable University policies, it is clear that University officials fully complied with internal procedural requirements. The University fully explained the various reporting options to the alleged victim, conducted investigations as required, offered the victim appropriate accommodation and expressed full support for the victim regardless of the option which she elected to pursue.

In June 2008, Jones informed Mason that he intended to retire in June 2009. Mason agreed to accept his resignation but requested Jones not make the decision public at that time so that he would not appear to be a "lame duck." Jones agreed to Mason's request. During this conversation, Jones also expressed to Mason his intention to become a higher education consultant after his retirement from the University.

The Regents learned of the two letters written by the victim's parents when the letters became public in mid-July. On July 22, the Regents convened a special meeting and established an advisory committee to address two issues:

1. Reopen the investigation of the University of Iowa's handling of the alleged sexual assault on a female student on the morning of October 14, 2007, including but not limited to:

   a. Using the June 12 Board's General Counsel's report as a starting point, conduct a review of all actions taken by

University personnel in response to the alleged assault from October 14, to the present;

    b. Assess whether the University's policies and procedures were followed;

    c. Evaluate each of the charges advanced in the November and May letters from the alleged victim's mother to the University; and

    d. Recommend any policy changes or other actions determined to be appropriate.

2. Examine the circumstances around the decision not to disclose to the Board of Regents the existence of the November and May letters, how the decision was made, and on what basis. Again, the Advisory Committee is to recommend any policy changes or other actions appropriate.

The committee was also authorized to "hire outside counsel as needed."

An agreement for special counsel was entered into between the Regents and Stolar, and in late July, Stolar began its investigation. The special agreement authorized Stolar to conduct the following activities:

(1) Review[] the specific allegations contained in the November 19, 2007, and May 16, 2008, letters written by the alleged victim's parents;

(2) Conduct[] personal interviews with the alleged victim and her parents;

(3) Conduct[] personal interviews of University students, officials and personnel, including, but not limited to, those who had been involved in past investigations of the incident;

(4) Interview[] persons with expertise in the areas of sexual violence victims' advocacy and rights;

(5) Analyze[] the reasons all relevant documents were not provided to the Board of Regents during its prior investigation of the incident;

(6) Review[] all current applicable University policies and procedures, including sexual assault and sexual harassment policies;

(7) Review[] such policies and procedures in conjunction with applicable state and federal laws and regulations;

(8) Evaluate[] the impact of relevant laws and court orders upon the University's response to the incident; and

(9) Review[] past investigations and recommendations of sexually related complaints and incidents at the University.

As part of its investigation, Jones and numerous other officials at the University were interviewed. Stolar also reviewed University policies and procedures, provisions of the Family Educational Rights and Privacy Act (FERPA) and its federal regulations, provisions of the Health Insurance Portability and Accountability Act (HIPAA), provisions of the Clery Act and its federal regulations, and relevant Iowa statutes.

On September 18, Stolar's report was provided to the Regents and various members of the university community, including Jones. The report was not made public at that time. The report evaluated the response to the incident by University departments and personnel and included: "(i) an assessment of whether relevant University policies and procedures were followed; (ii) identification of problems or concerns with existing policies and procedures; and (iii) preliminary recommendations regarding changes to policies and procedures." The report, which was highly critical of Jones, contained the following statements regarding his handling of the sexual assault allegation:

> The investigation confirmed that while Jones told the Student-Athlete's mother on November 13 that he "had nothing" on the alleged sexual assault and that he did not know her name or her daughter's name, Jones (a) was informed of the incident by Fred Mims on the morning of October 15, (b) had other conversations with Fred Mims during the first week after it occurred, and (c) had received a report on the incident from the Department of Athletics on October 23. Jones failed to give the Investigators any satisfactory explanation for this misstatement.
>
> . . . .
>
> . . . Jones was aware of the allegations against Football Player #1 on October 15. He was aware of the allegations against Football Player #2 by October 23 when he received

the Department of Athletics' report on the incident. At no point did he exercise his interim sanction power to remove either one of them from the dormitory they shared with the Student-Athlete. When the Student-Athlete was finally informed of the involvement of Football Player #2 on November 9, she realized that he had been living down the hall from her in a female student's room for three weeks.

. . . .

. . . The Office of the Vice President for Student Services and Dean of Students also failed in its responsibilities to the Student-Athlete. While Phillips Jones' failure to act did not technically violate the "letter" of the University's policies and procedures, his inaction was fundamentally inconsistent with the "substance" and intent of those policies. . . .

. . . .

. . . Phillip Jones' response to the retaliatory and harassing behavior directed at the Student-Athlete was insufficient and ineffective. . . . The letters Jones sent were not effectively worded and did not inform the student athletes that they had already been accused of conduct in violation of the University's anti-retaliation policy, and there was no in-person followup. . . . Jones failed to commence disciplinary action against the student-athletes identified by the Student-Athlete for their behavior, despite his authority to do so.

. . . .

. . . Jones' misstatements and poor communications were largely responsible for the Student-Athlete's mother's perception that the Department of Athletics was attempting to cover up her daughter's allegations.

. . . .

. . . The interview and notes show that he (Jones) believed the student athlete and her family to be "forum shopping," asking for his help when they became dissatisfied with the Department of Athletics' investigation.

. . . .

The Office of the Vice President for Student Services and Dean of Students failed in its responsibilities to the Student-Athlete and to the University in this case. Phillip Jones had the authority to intervene at numerous points in the process and to achieve the results necessary to protect the Student-Athlete. As early as the day after the alleged assault, Jones

knew of the incident and had authority and resources to separate the alleged perpetrators from the Student-Athlete.

At the direction of the Regents, the Stolar report was subsequently released to the public in its entirety. Jones and Mason spoke by telephone on September 19, at which time Jones indicated he disagreed with the conclusions in the report. Mason indicated that she agreed with the conclusions of the report, and requested an in-person meeting to discuss the report and Jones's further employment with the University. However, an in-person meeting did not take place because Jones was subsequently hospitalized as a result of a medical condition. On September 23, Mason sent Jones a letter terminating his employment with the University due to a "loss of confidence and trust in [him] based upon [his] failure to perform the duties and responsibilities of [his] position on behalf of the University of Iowa in response to the [October] 2007 sexual assault." On September 25, Mason made additional statements to the Regents regarding her decision to terminate Jones's employment. She stated:

> "Failing a student who asks for our help is unacceptable."

> "The Stolar report criticizes Jones for insensitivity, for telling the alleged victim that he did not know who she was."

> Mason also made the following statements to the media:

> "I need complete confidence in my senior staff moving forward and I no longer felt I had that with . . . Phil Jones."

> "I am disappointed, ashamed, embarrassed for how this case was handled. I was two and a half months on the job. I trusted my senior advisors to be doing what was supposed to be done. I followed as closely as I could. I was very disappointed when I learned how significantly some of my senior staff fell in terms of their responsibility."

> "I thought extremely hard and talked with . . . Phillip Jones about what (his) plans might be and gave (him) the opportunity to resign."

"I felt [the termination of Jones] was the right option."

Jones presented his side of the story to the Regents through a letter drafted by his legal counsel. Therein, he disagreed with Mason's decision to terminate him and the Stolar findings regarding his handling of the alleged sexual assault. The entire matter, including Jones's termination, was highly publicized in the media.

During the summer of 2009, Jones brought suit against the University, the Regents, Mason as president of the University and individually (collectively state defendants), and Stolar, alleging false light invasion of privacy, defamation, wrongful termination, intentional interference with an employment contract, intentional interference with prospective business advantages, due process violations, and civil rights violations. In June 2010, during the course of discovery, Jones filed a motion to compel discovery of written communications between the Regents and Stolar. The defendants, asserting attorney–client privilege, opposed the motion and produced a privilege log. Subsequently, the state defendants and Stolar each filed independent motions for summary judgment on Jones's claims against them. On January 31, 2012, the district court filed rulings denying the motion to compel and granting the defendants motions for summary judgment. Jones appealed and we retained the appeal.

## II. Standard of Review.

"We review the district court's decisions regarding discovery for an abuse of discretion." *Comes v. Microsoft Corp.*, 775 N.W.2d 302, 305 (Iowa 2009). "An abuse of discretion consists of a ruling which rests upon clearly untenable or unreasonable grounds." *Lawson v. Kurtzhals*, 792 N.W.2d 251, 258 (Iowa 2010). In reviewing decisions regarding

discovery, we give the district court wide latitude. *Exotica Botanicals, Inc. v. Terra Int'l, Inc.*, 612 N.W.2d 801, 804 (Iowa 2000).

We review questions of statutory interpretation for correction of legal error. *Hardin Cnty. Drainage Dist. 55 v. Union Pac. R.R.*, 826 N.W.2d 507, 510 (Iowa 2013). Our review of the district court's decision to grant summary judgment is also for corrections of errors of law. *Pitts v. Farm Bureau Life Ins. Co.*, 818 N.W.2d 91, 96 (Iowa 2012).

> A court should grant summary judgment if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. In other words, summary judgment is appropriate if the record reveals a conflict only concerns the legal consequences of undisputed facts. When reviewing a court's decision to grant summary judgment, we examine the record in the light most favorable to the nonmoving party and we draw all legitimate inferences the evidence bears in order to establish the existence of questions of fact.

*Id.* at 96–97 (citations and internal quotation marks omitted).

Finally, our review of Jones's constitutional claims is de novo. *State v. Becker*, 818 N.W.2d 135, 141 (Iowa 2012).

**III. Analysis.**

**A. The Motion to Compel Discovery.** Jones challenges the district court's ruling denying his motion to compel discovery of written communications between Stolar and the Regents. The court held that attorney–client privilege protected from disclosure roughly 250 items summarized in the privilege log produced by these defendants.[4]

---

[4]It is notable that Jones has not challenged the district court's decision to file rulings on the motion to compel and motions for summary judgment on the same day. Nor did he raise a timing argument below or file a motion to postpone ruling on the summary judgment motions until after he had a ruling on the motion to compel. *See Miller v. Cont'l Ins. Co.*, 392 N.W.2d 500, 503 (Iowa 1986) (holding plaintiffs were entitled to a ruling on their motion to compel prior to adjudication of defendants' motion for summary judgment).

1. *Attorney–client privilege and waiver.* On appeal, Jones assigns error to the district court's ruling on attorney–client privilege. Alternatively, Jones claims that by releasing the Stolar report, the Regents waived the attorney–client privilege as to all confidential communications between the Regents and Stolar concerning the report. We elect to bypass both of these arguments. Even if we found the district court's ruling on Jones's motion to compel was erroneous, we would still conclude that the error is harmless because Jones has not even attempted to articulate how the withheld communications would have altered the outcome on any of his claims.

It is well-settled that nonprejudicial error is never ground for reversal on appeal. *See Bengford v. Carlem Corp.,* 156 N.W.2d 855, 867 (Iowa 1968). Furthermore, we do not presume the existence of prejudice based on an erroneous discovery ruling. *See James v. Hyatt Regency Chi.*, 707 F.3d 775, 784 (7th Cir. 2013) ("We shall not reverse the district court's ruling [on a motion to compel] absent a clear showing that the denial of discovery resulted in actual and substantial prejudice . . . ."); *Team Cent., Inc. v. Teamco, Inc.*, 271 N.W.2d 914, 922 (Iowa 1978) (noting that an erroneous discovery ruling on privilege must be "of sufficient importance to justify a reversal"); *Schroedl v. McTague*, 169 N.W.2d 860, 865 (Iowa 1969) (holding that even if trial court's discovery ruling on party's request for admissions was erroneous, there was "no ground for a reversal as no prejudice therefrom appear[ed] in the record"). "[T]he burden rests upon the appellant not only to establish error but to further show that prejudice resulted." *In re Behrend's Will,* 233 Iowa 812, 818, 10 N.W.2d 651, 655 (1943).

In this appeal, Jones has made no attempt to refute the entire subsection of the state defendants' brief which argued that disclosure of

all of the communications at issue would not have altered the outcome on any of his claims. He has merely alleged that he was "restrained" from presenting evidence to support his claims on summary judgment because of the district court's ruling on the motion to compel. We recognize the difficulty faced by a party appealing the denial of a motion to compel. It is impossible for the party to know with exactitude the content of the information sought or the extent to which it may have supported the party's claims or defenses. Nevertheless, at a minimum, we must require Jones to advance some explanation of *how* he expected the withheld communications to support the claims alleged in this lawsuit. *See Ginsburg v. InBev NV/SA*, 623 F.3d 1229, 1236 (8th Cir. 2010) (upholding district court ruling barring depositions of CEOs based on failure "to allege specific prejudice" from the ruling); *Dennis v. Osram Sylvania, Inc.*, 549 F.3d 851, 860 (1st Cir. 2008) (finding no prejudicial error based on denial of motion to compel where the challenging party did not allege the withheld documents would yield any information in support of his claim); *Caisson Corp. v. Ingersoll-Rand Co.*, 622 F.2d 672, 684–85 (3d Cir. 1980) (declining to reverse based on plaintiff's improper failure to produce certain documents in response to discovery requests absent "a showing of specific prejudice, rather than general prejudice"). A bare assertion of prejudice based on an inability to "access all the evidence" is not enough.[5] Accordingly, we affirm the district court's ruling on the motion to compel.

---

[5]We also note that our resolution of the state sovereign immunity issue significantly diminishes the potential usefulness of the withheld communications. Jones's defamation, false light invasion of privacy, and intentional interference claims against the state defendants are all barred by the Iowa Tort Claims Act. His employment discrimination claim is lodged only against Mason. However, Mason was only a party to one communication which is listed as a "request for documents" in the privilege log. The communications could not possibly affect our analysis on the procedural due process claim. That leaves his wrongful discharge claims against the

**B. Summary Judgment on Claims Against the State Defendants.**

1. *False light and defamation claims.* Jones challenges the district court's grant of summary judgment on his false light invasion of privacy and defamation claims against the state defendants. Accordingly, we must examine whether the Iowa Tort Claims Act shields the state defendants from tort liability.

a. *Claims against the institutional state defendants.* We have recently examined the Iowa Tort Claims Act (ITCA) in some detail. "Generally, the State may be sued for damage caused by the negligent or wrongful acts or omissions of state employees while acting within the scope of employment to the same extent that a private person may be sued." *McGill v. Fish*, 790 N.W.2d 113, 117 (Iowa 2010) (citing Iowa Code § 669.2(3)(*a*) (1995)). State employees engaging in wrongful conduct may also be sued personally. *Id.* (citing Iowa Code § 669.2(3)(*b*)). Yet, as long as the employee was acting within the scope of employment at all relevant times, the suit is deemed to be an action against the state. Iowa Code § 669.5(2) (2009); *see also Dickerson v. Mertz*, 547 N.W.2d 208, 212 (Iowa 1996) (finding state department of natural resources employees were cloaked with sovereign immunity because plaintiff did not allege they were acting outside the scope of their employment).

Prior to the enactment of ITCA, the doctrine of sovereign immunity protected the state and its agencies from suits in tort. *Lloyd v. State*, 251 N.W.2d 551, 555 (Iowa 1977). ITCA modified the doctrine by waiving immunity for some torts against the government and its agencies. *Id.*

_____
state defendants, as well as the defamation and intentional interference claims against Stolar. We find it doubtful the communications at issue could rescue any of these claims. In any event, it is Jones's burden to establish *how* the evidence sought could have altered the outcome.

The waiver of sovereign immunity, however, applies only to the actions specified in the statute. *Id.* Defamation claims against the state are barred by ITCA, which prohibits a litigant from bringing "[a]ny claim arising out of assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights." Iowa Code § 669.14(4). Similarly, we find Jones's false light claims against the state are barred by ITCA. The Southern District of Iowa recently considered similar claims against these same defendants based on the Stolar report. *Mills v. Iowa Bd. of Regents*, 770 F. Supp. 2d 986 (S.D. Iowa 2011). The court concluded the "[p]laintiff's cause of action for false light invasion of privacy is founded on precisely those allegedly false statements by Mason . . . that form the basis for his defamation claims," and, therefore, "[p]laintiff's false light invasion of privacy claim 'arises' out of a claim for defamation, such that it is barred by [Iowa Code section] 669.14(4)." *Id.* at 998. We agree with the federal court's conclusion. Because the state is immune from suit for false light invasion of privacy and defamation under ITCA, the district court was correct in granting summary judgment in favor of the institutional state defendants.

b. *Defamation and false light claims against Mason.* Jones's defamation and false light claims against Mason may proceed if the conduct at issue is deemed to have been outside the scope of her employment. Iowa Code section 669.5 states:

> Upon certification by the attorney general that a defendant in a suit was an employee of the state acting within the scope of the employee's office or employment at the time of the incident upon which the claim is based, the suit commenced upon the claim shall be deemed an action against the state . . . .

Iowa Code § 669.5(2)(*a*). In this case, the Attorney General certified that Mason was acting within the scope of her employment as President of the University of Iowa at all relevant times.

Iowa Code section 669.5(2)(*b*) gives a defendant the option to petition the court if the attorney general refuses to certify that a state employee was acting within the scope of his or her office. However, it does not expressly provide for a plaintiff to petition for reversal of the attorney general's decision to certify. *Id.* § 669.5(2)(*b*). Accordingly, Mason argues the attorney general's certification is conclusive on the question of whether she was acting within the scope of her employment and Jones's action against her must be considered an action against the state. In *Mills*, the Iowa federal district court agreed with this position regarding the conclusiveness of the attorney general's certification under section 669.5(2)(*a*). 770 F. Supp. 2d at 994–95.

Conversely, Jones contends the district court erred in accepting the attorney general's certification as binding. In support of this position, he points out that section 669.5(2)(*b*) does not expressly prevent the district court from reexamining the facts to determine whether the attorney general's certification was correct. Alternatively, he argues section 669.5(2)(*b*) is unconstitutional. Ultimately, we need not reach Jones's statutory construction and constitutional arguments concerning section 669.5(2)(*b*). *See State v. Button*, 622 N.W.2d 480, 485 (Iowa 2001) ("Ordinarily we will not pass upon constitutional arguments if there are other grounds on which to resolve the case."). Assuming without deciding that the attorney general's certification is not conclusive and binding on the court, we still conclude Mason was acting within the scope of her employment at all relevant times.

Section 669.2 of ITCA sets forth the following definition: " '*Acting within the scope of the employee's office or employment*' means acting in the employee's line of duty as an employee of the state." Iowa Code § 669.2(1). At common law we have explained the scope of employment concept as follows:

> for an act to be within the scope of employment the conduct complained of must be of the same general nature as that authorized or incidental to the conduct authorized. Thus, an act is deemed to be within the scope of one's employment where such act is necessary to accomplish the purpose of the employment and is intended for such purpose. The question, therefore, is whether the employee's conduct is so unlike that authorized that it is substantially different.

*Godar v. Edwards*, 588 N.W.2d 701, 705–06 (Iowa 1999) (citations and internal quotation marks omitted). While we acknowledge *Godar* discusses scope of employment in the context of respondeat superior, we find this common law formulation instructive.

Jones essentially argues Mason improperly blamed him for the mishandling of the sexual assault investigation in order to protect herself and preserve her position with the University. He contends "[h]eaping false blame on Jones was not her 'job' as the University's President" and, accordingly, her conduct was outside the scope of her employment. As discussed below, it is undisputed in this record that Jones was terminated due to Mason's loss of confidence in his professional abilities based on his handling of the sexual assault incident. A termination on this basis was well within the scope of Mason's employment. We are not persuaded that a genuine issue of material fact exists on this issue. Therefore, Mason enjoys the same sovereign immunity as the institutional state defendants. *See* Iowa Code § 669.5(2)(*a*).

2. *Intentional interference claims.*[6]   Jones challenges the district court's grant of summary judgment on his claims against Mason for intentional interference with an existing employment contract and intentional interference with prospective business advantages.   ITCA does not waive state sovereign immunity for "[a]ny claim arising out of . . . interference with contract rights."   *Id.* § 669.14(4).   Accordingly, claims against the state for intentional interference with an existing employment contract are barred.   Moreover, we interpreted this statutory language in *North v. State* and concluded that the "interference with contract rights" language encompasses claims of tortious interference with prospective business advantages.   400 N.W.2d 566, 569–70 (Iowa 1987).   Because we have determined that Mason was acting within the scope of her employment, Jones's intentional interference claims are deemed claims against the state barred by ITCA.

3. *Wrongful discharge.*   Jones also alleged wrongful discharge in violation of public policy against the state defendants.   We first recognized this tort in 1988.   *Springer v. Weeks & Leo Co.*, 429 N.W.2d 558, 560 (Iowa 1988) ("We believe a cause of action should exist for tortious interference with the contract of hire when the discharge serves to frustrate a well-recognized and defined public policy of the state.").   Wrongful discharge is an exception to Iowa's general rule that employment is at-will.   *Berry v. Liberty Holdings, Inc.*, 803 N.W.2d 106, 109 (Iowa 2011).   At-will employment "means that, absent a valid

---

[6]Jones does not appeal the summary judgment ruling on his claim of intentional interference with an employment contract against the institutional state defendants. Citing *Klooster v. North Iowa State Bank*, he correctly concedes that because the institutional state defendants were parties to the employment relationship, they cannot be liable under an intentional interference with existing business relationships theory. 404 N.W.2d 564, 570 (Iowa 1987).   Nor does he appeal the district court ruling on his claim of intentional interference with prospective business advantages against the institutional state defendants.

contract of employment, the employment relationship is terminable by either party at any time, for any reason, or for no reason at all." *Id.* (citation and internal quotation marks omitted). The narrow public-policy exception to the at-will employment doctrine "limits an employer's discretion to discharge an at-will employee when the discharge would undermine a clearly defined and well-recognized public policy of the state." *Id.*

We have set forth the parameters of a successful claim of wrongful discharge in violation of public policy as follows:

> (1) the existence of a clearly defined and well-recognized public policy that protects the employee's activity; (2) this public policy would be undermined by the employee's discharge from employment; (3) the employee engaged in the protected activity, and this conduct was the reason the employer discharged the employee; and (4) the employer had no overriding business justification for the discharge.

*Dorshkind v. Oak Park Place of Dubuque II, L.L.C.*, 835 N.W.2d 293, 300, 2013 WL 3958293, at *6 (Iowa 2013) (quoting *Berry*, 803 N.W.2d at 109–10).

Jones claims that Mason violated the University's conflict-of-interest regulations when she terminated him. Section 18.5(b) of the University's Operations Manual states: "any activity that has significant financial or personal considerations for employees that may compromise, or appear to compromise, their professional judgment must be disclosed and managed." We have recognized that "administrative regulations can serve as a source of public policy to give rise to a claim of wrongful discharge from employment." *Jasper v. H. Nizam, Inc.*, 764 N.W.2d 751, 757 (Iowa 2009). However, Jones has not alleged that he was terminated for engaging in any activity protected by the University's conflict-of-interest regulations. Thus, the first element of the tort has not been met.

Jones also argues the University's sexual assault policy contains a clearly defined public policy of the state and that he was terminated for following it. It is unnecessary to examine whether Jones can satisfy the first two requirements of the public policy exception because there is no evidence that would permit a reasonable jury to conclude Jones was terminated for following the sexual assault policy. Mason's letter to Jones explaining his termination stated,

> This action is the result of my loss of confidence and trust in you based upon your failure to perform the duties and responsibilities of your position on behalf of the University of Iowa in response to the [October] 2007 sexual assault.

In order to avoid summary judgment, Jones needs to establish that a reasonable jury could find he was fired *because* he followed the sexual assault policy. However, he has not cited any record evidence criticizing him for following the sexual assault policy. To the contrary, while the Stolar report concluded Jones had not violated the "letter" of the University sexual assault policy, it concluded his conduct was "fundamentally inconsistent with [its] 'substance' and intent." The report also concluded that, although Jones was aware of the allegations against the two football players, he never exercised his power to remove either one of them from the dormitory they shared with the alleged victim. The report further concluded that Jones's "response to the retaliatory and harassing behavior directed at the victim was insufficient and ineffective." Instead of exercising his authority to commence disciplinary action against those harassing the alleged victim, Jones merely sent them letters informing them of the existence of the University's anti-retaliation policy. Thus, the record evidence only demonstrates Jones's termination was based on a reportedly inadequate utilization of the

policy to secure the rights and safety of the alleged victim.[7] Accordingly, the record does not contain a genuine issue of material fact as to whether Jones was fired for following the sexual assault policy, and we must affirm the district court's ruling on Jones's wrongful discharge claim.

4. *Due process.* The district court granted summary judgment for the state defendants on Jones's due process claims brought under 42 U.S.C. § 1983 (2006 & Supp. V. 2011). This claim was properly disposed as to the institutional state defendants because the University of Iowa and the Board of Regents are not persons within the meaning of § 1983. *See, e.g., Will v. Mich. Dep't of State Police*, 491 U.S. 58, 64–66, 109 S. Ct. 2304, 2308–11, 105 L. Ed. 2d 45, 53–55 (1989). However, Jones has properly alleged this claim against Mason in her individual capacity. *See Burlison v. Springfield Pub. Sch.*, 708 F.3d 1034, 1041 (8th Cir. 2013) ("A government official can be liable [under § 1983] in his individual capacity if 'a causal link to, and direct responsibility for, the deprivation of rights' is shown." (quoting *Mayorga v. Missouri*, 442 F.3d 1128, 1132 (8th Cir. 2006)). Jones contends Mason violated the Due Process Clause by denying him the benefit of a name-clearing hearing.

"Due process is a flexible concept that varies with the particular situation, and its fundamental requirement . . . is the opportunity to be heard at a meaningful time and in a meaningful manner." *United States v. BP Amoco Oil PLC*, 277 F.3d 1012, 1017 (8th Cir. 2002) (citation and internal quotation marks omitted). Procedural due process claims center on the "requirement that a person in jeopardy of serious loss [be given]

---

[7]Notably, in support of his defamation claim against Mason, Jones contends he was fired *because* Mason was using him as a scapegoat in order to protect her own professional interests.

notice of the case against him and opportunity to meet it." *Mathews v. Eldridge*, 424 U.S. 319, 348–49, 96 S. Ct. 893, 909, 47 L. Ed. 2d 18, 41 (1976) (citation and internal quotation marks omitted). Further, "[a]ll that is necessary is that the procedures be tailored . . . to the capacities and circumstances of those who are to be heard, to insure that they are given a meaningful opportunity to present their case." *Id.* at 349, 96 S. Ct. at 909, 47 L. Ed. 2d at 41 (citation and internal quotation marks omitted).

We have established a two-step process for determining whether a procedural due process violation has occurred. *State v. Seering*, 701 N.W.2d 655, 665 (Iowa 2005). First, we must determine whether we are dealing with a protected liberty or property interest. *Id.* Second, if we determine that a protected interest is at stake, we balance three factors to determine what process is due. *Id.*

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement[s] would entail.

*Mathews*, 424 U.S. at 335, 96 S. Ct. at 903, 47 L. Ed. 2d at 33; *accord Seering*, 701 N.W.2d at 665.

As stated by the Eighth Circuit,

> "An employee's liberty interests are implicated where the employer levels accusations at the employee that are so damaging as to make it difficult or impossible for the employee to escape the stigma of those charges. The requisite stigma has generally been found when an employer has accused an employee of dishonesty, immorality, criminality, racism, and the like."

*Putnam v. Keller*, 332 F.3d 541, 546 (8th Cir. 2003) (quoting *Winegar v. Des Moines Indep. Cmty. Sch. Dist.*, 20 F.3d 895, 899 (8th Cir. 1994)).

When a government employer makes such accusations, an employee's due process rights are vindicated by a pretermination name-clearing hearing giving the employee an opportunity to respond. *Winskowski v. City of Stephen*, 442 F.3d 1107, 1110 (8th Cir. 2006). This hearing need not be elaborate. *Id.* Even "an informal meeting[] with supervisors may constitute a sufficient pre-termination hearing." *Id.* (citation and internal quotation marks omitted).

In *Rush v. Perryman*, the Eighth Circuit held that a college president had a due process right to a name clearing hearing after he was terminated amidst accusations of "dishonesty, insubordination, failure to comply with state laws, and willful disregard of board policy." 579 F.3d 908, 910, 913 (8th Cir. 2009). In contrast, Mason's statements regarding Jones's termination merely stated she had lost confidence in Jones's ability to fulfill his professional responsibilities. She also indicated that he had failed a student and demonstrated insensitivity. While Mason's comments could undoubtedly be interpreted as accusations of professional incompetence, such accusations fall substantially short of the level of stigma required to establish a constitutionally protected liberty interest. *See Anderson v. Low Rent Hous. Comm'n of Muscatine*, 304 N.W.2d 239, 244–45 (Iowa 1981) (finding no liberty interest attendant to allegations of petulance and insubordination and noting that courts have generally held allegations of incompetence do not implicate a due process liberty interest) (citing cases). The facts viewed in the light most favorable to Jones do not establish a genuine fact issue as to whether Jones suffered a procedural due process violation.

5. *Employment discrimination.* Jones also appeals the summary judgment ruling on his employment discrimination claim against Mason. He claimed he was fired based on his race and gender in violation of 42 U.S.C. § 1983.[8] The district court concluded Jones failed to properly plead a claim of employment discrimination, apparently based on the state defendants' argument that no cause of action for employment discrimination exists under § 1983 and that Jones was trying to use § 1983 to circumvent the procedural and jurisdictional requirements of Title VII. The court further concluded that even if Jones had properly pled an employment discrimination claim, the state defendants were entitled to summary judgment on it. We affirm because Jones has not generated a jury question on the pretext element of his claim.

Title VII of the Civil Rights Act of 1964 makes it unlawful to "discharge . . . or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2. On the other hand, 42 U.S.C. § 1983 provides a private right of action to any U.S. citizen who is deprived of "any rights, privileges, or immunities secured by the Constitution and laws" by any person acting "under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia." 42 U.S.C. § 1983. Section 1983 does not establish any substantive rights, rather it serves as a mechanism to enforce rights "secured by the Constitution of the United States or by any Act of Congress providing for equal rights." *Chapman v. Houston Welfare*

---

[8]Jones is an African-American male.

*Rights Org.*, 441 U.S. 600, 618, 99 S. Ct. 1905, 1916, 60 L. Ed. 2d 508, 523 (1979).

It is thoroughly established in the federal appellate courts that, while Title VII is the exclusive remedy for any violation created by its terms, "its exclusivity ceases when the employer's conduct also amounts to a violation of a right secured by the Constitution." *Henley v. Brown*, 686 F.3d 634, 642 (8th Cir. 2012) (citing federal circuit court cases). Hence, an employment discrimination plaintiff may proceed under § 1983 if intentional race or gender discrimination is alleged in violation of the Equal Protection Clause in the Fourteenth Amendment. *See, e.g.*, *Hervey v. City of Little Rock*, 787 F.2d 1223, 1233 (8th Cir.1986); *see also Annis v. County of Westchester*, 36 F.3d 251, 254 (2d Cir. 1994) ("Congress did not intend to make Title VII the exclusive remedy for employment discrimination claims, at least not those claims cognizable under the Constitution."). In the context of employment discrimination it is similarly established that Title VII and § 1983 constitute parallel causes of action "and the elements of a prima facie case are the same regardless of which statute the plaintiff uses to seek relief." *Wright v. Rolette County*, 417 F.3d 879, 884 (8th Cir. 2005); *see also Lauderdale v. Tex. Dep't of Criminal Justice*, 512 F.3d 157, 166 (5th Cir. 2007) ("Section 1983 and title VII are parallel causes of action[] [and a]ccordingly, the inquiry into intentional discrimination is essentially the same for individual actions brought under sections 1981 and 1983, and Title VII." (citations and internal quotation marks omitted)); *Demoret v. Zegarelli*, 451 F.3d 140, 149 (2d Cir. 2006) (holding that once color of law is established a § 1983 claim is analogous to an employment discrimination claim under Title VII, except § 1983 claims can be brought against an individual); *Richmond v. Bd. of Regents*, 957 F.2d 595, 598 (8th Cir.

1992) (requiring the same prima facie showing for race discrimination claims under Title VII and 42 U.S.C. § 1983). Therefore, Jones was not required to follow the statutorily prescribed administrative procedure required to file a claim under Title VII. *See* 42 U.S.C. § 2000e–5(b), (c), (e), (f)(1)). Further, he has properly pled an employment discrimination claim by invoking § 1983 and advancing the *McDonnell Douglas*[9] framework for intentional discrimination well recognized in Title VII jurisprudence.

> To make a prima facie case under the *McDonnell Douglas* framework, [a plaintiff must] show that (1) she was a member of the protected group; (2) she was qualified to perform the job; (3) she suffered an adverse employment action; and (4) circumstances permit an inference of discrimination. Such a showing creates a presumption of unlawful discrimination, requiring [a defendant] to produce a legitimate nondiscriminatory reason for its employment action. The burden then returns to [the plaintiff] to prove that [the defendant]'s proffered reason for firing her is pretextual.

*Lewis v. Heartland Inns of Am., L.L.C.*, 591 F.3d 1033, 1038 (8th Cir. 2010) (citation and internal quotation marks omitted).

We find it unnecessary to resolve the question of whether Jones has made out a prima facie case of discrimination. Mason has produced a legitimate nondiscriminatory reason for Jones's termination and, accordingly, the burden shifts to Jones to show that the proffered reason is pretextual. When we evaluate all the evidence in the light most favorable to Jones, there is no genuine fact issue as to whether he has carried this burden. In support of his claim, Jones points to Mason's deposition testimony. Therein, Mason explains that one of the Stolar attorneys described Jones's response to the Stolar investigation as "very

---

[9]*McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973).

defensive and belligerent," "angry," "argumentative," "not particularly cooperative," and "angry and defensive in his posture and demeanor." He argues that these statements are reflective of common stereotypes portraying African-American men as "lazy, shiftless, belligerent, abusive, and aggressive." We are mindful that adverse employment actions based on race and gender stereotypes constitute illegal discrimination. *See id.* at 1042. However, in this case the record does not reveal a genuine issue of material fact to allow a reasonable jury to conclude Mason's decision to terminate him was based on improper stereotypes about African-American males.

After reviewing the Stolar report, which, as discussed above, was highly publicized and highly critical of Jones's management of the incident, Mason issued Jones a letter terminating him based on a "loss of confidence and trust in [him] based upon [his] failure to perform the duties and responsibilities of [his] position on behalf of the University of Iowa in response to the [October] 2007 sexual assault." All of Mason's statements concerning Jones's termination corroborate the legitimate nondiscriminatory motivation given in the letter. Further, there is no evidence that Mason held the allegedly stereotypical views or applied them to Jones. In making the above statements, Mason was merely recalling the characterization of Jones's conduct given to her by one of the Stolar attorneys conducting the investigation. None of the statements, which Jones contends evince improper stereotyping, were ever given as a reason for his termination.[10] Finally, Mason also terminated Marcus Mills, the University's general counsel, who is

---

[10]It is noteworthy that, throughout this litigation, Jones has contended Mason terminated him for the purpose of preserving her own position—a motivation distinctly independent from any form of racial or gender-based animus.

Caucasian, based on her assessment of the Stolar report. *See Rose-Maston v. NME Hosp., Inc.*, 133 F.3d 1104, 1109 n.4 (8th Cir. 1998) (noting that failure to prove similarly situated employees were treated differently is fatal under the *McDonnell Douglas* framework). Thus, it is undisputable that Jones's termination was due to Mason's loss of confidence in Jones's professional abilities based on his handling of the sexual assault incident. The district court's ruling granting Mason summary judgment on Jones's employment discrimination claim is affirmed.

**C. Summary Judgment on Claims Against Stolar.** Jones also appeals the district court's rulings granting Stolar summary judgment on his claims against them for defamation and intentional interference with contractual relationships and prospective business advantages. We review the district court's ruling on each claim in turn.

1. *Defamation claim against Stolar.* The district court did not consider the elements of Jones's defamation claims against Stolar because it found no fact issue on the question of whether Stolar enjoyed a qualified privilege with respect to the alleged defamatory statements contained in its report. A public figure[11] alleging defamation carries the burden to show a reasonable jury could find by clear and convincing evidence that (1) the challenged statements were false and (2) the statements were made with "actual malice." *Stevens v. Iowa Newspapers, Inc.*, 728 N.W.2d 823, 826 (Iowa 2007).

Qualified privilege is an affirmative defense in a defamation action. *Barreca v. Nickolas*, 683 N.W.2d 111, 116–17 (Iowa 2004).

---

[11]Jones concedes that he is a public figure for the purposes of his defamation claim.

> The law affords defendants privileges because [s]ometimes one is justified in communicating to others, without liability, defamatory information. . . . The law recognizes certain situations may arise in which a person, in order to protect his own interests or the interests of others, must make statements about another which are indeed libelous. When this happens, the statement is said to be privileged, which simply means no liability attaches to its publication.

*Id.* at 116–17 (citation and internal quotation marks omitted). We have recognized that " '[t]he doctrine of privileged communication is based upon the principle of good public policy.' " *Id.* at 117 (quoting *Mills v. Denny*, 245 Iowa 584, 587, 63 N.W.2d 222, 224 (1954)). "Instances abound where the individual must surrender his [or her] personal rights and suffer loss for the benefit of the common welfare." *Mills*, 245 Iowa at 587, 63 N.W.2d at 224.

In order to demonstrate the existence of qualified privilege in an action for defamation a defendant must prove:

> (1) the statement was made in good faith, (2) the defendant had an interest to uphold, (3) the scope of the statement was limited to the identified interest, and (4) the statement was published on a proper occasion, in a proper manner, and to proper parties only.

*Theisen v. Covenant Med. Ctr., Inc.*, 636 N.W.2d 74, 84 (Iowa 2001). The privilege may be lost "if the speaker acts with actual malice, or exceeds or abuses the privilege through, for example, excessive publication or through publication to persons other than those who have a legitimate interest in the subject of the statements." *Id.*; *see also Spencer v. Spencer*, 479 N.W.2d 293, 297 (Iowa 1991) ("The qualified privilege by its very nature does not allow widespread or unrestricted communication."). For the purpose of establishing actual malice to preclude a finding of qualified privilege, a plaintiff must show the statement was made with knowing or reckless disregard for whether it was true or false. *Barreca*, 683 N.W.2d at 121. As Jones correctly notes, it is generally the district

court's responsibility to determine whether a defendant's statement is qualifiedly privileged, and a jury question as to whether the privilege was abused. *See id.* at 118.

Jones argues that several statements in the Stolar report sharply criticizing him for mishandling the sexual assault were defamatory. Specifically, Jones takes issue with the repeated assertion that he had "failed" in his job responsibilities. He contends "Stolar's words singling [him] out . . . as having 'failed' or as a 'failure' nine times . . . were capable of defamatory meaning." Jones alleges that qualified privilege does not apply to the statements at issue because the statements were published with actual malice, were unnecessary to achieve the privileged interest, and because Stolar abused the privilege by publishing excessively.

Jones's claim that Stolar's reported comments concerning his conduct were made with actual malice suffers from an absence of evidence. Jones only attempts to demonstrate the falsity of the statements at issue, several of which are opinions not subject to a factual determination. *See Yates v. Iowa W. Racing Ass'n,* 721 N.W.2d 762, 774 (Iowa 2006) (explaining that no cause of action for defamation shall lie when the statements at issue are opinions and are not objectively verifiable). Even if, for the sake of argument, we assume some of the statements at issue are false, Jones has not identified a single piece of record evidence suggesting that Stolar acted with reckless disregard for the truth at any stage of its investigation or in the preparation of its report. To the contrary, the record demonstrates Stolar's conclusions were based on a thorough and deliberate investigation. *Cf. Barreca,* 683 N.W.2d at 123 (finding a jury question on the issue of actual malice where statements were published based on "an anonymous and

uncorroborated tip"). Thus, the record fails to show there is a genuine issue of fact on the question of actual malice.

Nor does the record contain a genuine fact issue on the question of whether the scope of Stolar's statements exceeded the privileged interest. Stolar was hired by the Regents to assist in "conduct[ing] a review of all actions taken by University personnel in response to the alleged assault" and "[a]ssess[ing] whether the University's policies and procedures were followed." The retainer agreement tasked Stolar with "review[ing] past investigations and recommendations of sexually related complaints and incidents at the University." Thus, providing assessments on the management of the sexual assault investigation by University personnel, including Jones, was a privileged interest established by the retainer agreement with Stolar. All of the statements at issue go to the very heart of the assignment with which Stolar was tasked. There is no plausible dispute as to whether Stolar exceeded the scope of the privilege by issuing a report containing statements critical of Jones's handling of the alleged assault. *See Bitner v. Ottumwa Cmty. Sch. Dist.*, 549 N.W.2d 295, 303 (Iowa 1996) (affirming summary judgment for CPA firm because qualified privilege applied to allegedly defamatory statements contained in audit prepared on behalf of a school board).

Jones's claim of excessive publication is based on record evidence demonstrating that Stolar knew the Regents would make its report public. However, this fact is of small import in our analysis. Stolar submitted its report to the Regents and its advisory committee, the individuals who had retained Stolar to prepare the report. The Regents unquestionably had a legitimate interest in the statements contained therein, and it was the Regents's decision to make the report public. Without some allegation that Stolar played a role in the decision to

publish the report to the public, Jones has not properly alleged a claim of excessive publication. *See Robinson v. Home Fire & Marine Ins. Co.*, 244 Iowa 1084, 1095, 59 N.W.2d 776, 783 (1953) (" 'If a defendant deliberately adopts a method of communication that gives unnecessary publicity to defamatory statements, he cannot successfully invoke the defense of qualified privilege.' " (quoting *Bereman v. Power Publ'g Co.*, 27 P.2d 749, 751 (Colo. 1933))). Accordingly, we are unable to identify the existence of any jury question on the issue of qualified privilege under the facts alleged and the ruling granting Stolar summary judgment on Jones's defamation claim is affirmed.

2. *Intentional interference claims against Stolar.* Finally, Jones appeals the district court's rulings on his claims of intentional interference with contractual relationships and prospective business advantages against Stolar.

> To recover for intentional interference with an existing contract, a plaintiff must show: "(1) plaintiff had a contract with a third-party; (2) defendant knew of the contract; (3) defendant intentionally and improperly interfered with the contract; (4) the interference caused the third-party not to perform, or made performance more burdensome or expensive; and (5) damage to the plaintiff resulted."

*Kern v. Palmer Coll. of Chiropractic*, 757 N.W.2d 651, 662 (Iowa 2008) (quoting *Green v. Racing Ass'n of Cent. Iowa*, 713 N.W.2d 234, 243 (Iowa 2006)).

> The tort of intentional interference with prospective business advantage imposes liability on a person who intentionally and improperly interferes with the claimant's business expectancies "whether the interference consists of (a) inducing or otherwise causing a third person not to enter into or continue the prospective relation or (b) preventing the other from acquiring or continuing the prospective relation."

*Gordon v. Noel*, 356 N.W.2d 559, 563 (Iowa 1984) (quoting Restatement (Second) of Torts § 766B (1979).

Jones contends Stolar was aware that after he retired from the University he planned to form a higher education consulting business.[12] Maintaining his position that Stolar published falsehoods in its report, he contends Stolar improperly interfered with his employment contract with the University and with his prospective business plans. Both torts alleged by Jones, intentional interference with contract and intentional interference with prospective business relations, require that he prove that Stolar "intentionally and improperly interfered with the relationship at issue." *Compiano v. Hawkeye Bank & Trust of Des Moines*, 588 N.W.2d 462, 464 (Iowa 1999). The difference between the two torts, however, is that to recover for interference with prospective business relations, Jones must prove that Stolar "acted with the sole or predominant purpose to injure or financially destroy the plaintiff." *Id.* For the same reasons we found that the statements at issue were within the scope of a privileged interest, we conclude Jones has not generated a fact issue on the threshold question of intentional and improper interference under either circumstance. The district court was correct in granting summary judgment to Stolar on these claims.

**IV. Disposition.**

We affirm the district court's ruling on the motion to compel discovery and affirm the district court's grant of summary judgment in favor of the defendants.

**AFFIRMED.**

---

[12]Stolar disputes this fact.