# United States Court of Appeals
## For the Eighth Circuit

_____

No. 15-3801

_____

Mandy Liles

*Plaintiff - Appellant*

v.

C.S. McCrossan, Inc.; C.S. McCrossan Construction, Inc.

*Defendants - Appellees*

_____

Appeal from United States District Court
for the District of Minnesota - St. Paul

_____

Submitted: October 19, 2016
Filed: March 21, 2017

_____

Before GRUENDER, BEAM, and SHEPHERD, Circuit Judges.

_____

SHEPHERD, Circuit Judge.

Mandy Liles brought this action against C.S. McCrossan, Inc. and C.S. McCrossan Construction, Inc. (collectively "CSM") asserting a number of civil rights claims. The district court[1] granted CSM's motion for summary judgment and Liles appealed. We affirm.

_____

[1]The Honorable Paul A. Magnuson, United States District Judge for the District of Minnesota.

## I. Background

CSM is engaged in the construction business and specializes in providing highway and heavy general contracting to various levels of government transportation departments. CSM hired Liles in 2004 following her graduation from college. The first several years of her employment were generally positive, and she was promoted from her original role of project engineer to assistant project manager. During this time, she had a good relationship with Tom McCrossan, the owner of CSM. McCrossan took a personal interest in Liles's career development by taking her to lunch meetings and attempting to introduce her to influential people in the construction industry. Her experience changed toward the end of 2009, however, when she turned down the romantic advances of fellow employee Tom Peterson, Jr. ("Junior"). According to Liles, after this event, Junior made a number of lewd comments to her in person and via email. She reported this conduct to CSM, and the company reprimanded Junior. After that reprimand, Junior's conduct ceased and Liles testified that she had no further communication with Junior after December of 2009.

Junior's father, Tom Peterson, Sr. ("Senior"), is the Underground Division Manager[2] at CSM, and he was known around CSM as someone who would hold grudges and make people's "lives at work difficult for a long time." Senior was apparently so enraged by the fact that Liles reported his son that Senior thereafter began calling her names such as "rotten" and "tuna fish." Although he never said these things directly to her, Liles claims she heard Senior call her these names to other people between two and five times in a two-year period between 2010 and 2011. The final comment she alleges is that he told another employee to "put the

_____

[2]Senior was a long-time CSM employee, but he was not in Liles's chain of command.

screws to her" in late 2010 or early 2011. Liles did not report these comments to anyone at CSM.

In 2010, Liles was assigned to work with a woman named Deb Petry on the Devil's Triangle project in Brooklyn Park, Minnesota, on which CSM was contracted to construct bridges across a number of major throughways and a railroad line. Although Petry was certified as a crane operator, she was employed by CSM as a crane oiler.[3] At some point, Petry told Liles that Petry was not getting the training on the lattice boom crane that she was supposed to receive. After Liles reported the issue to both the foreman on the project and a CSM division manager, Petry was still not given training time on the crane. Liles then told McCrossan, and, shortly thereafter, Petry was given training on the crane.

In the fall of 2010, Liles accepted an offer to be an assistant project manager in charge of Project Controls on the Central Corridor Light Rail Transit ("CCLRT") project. This project was a joint venture between CSM and Ames Construction with the ultimate goal of constructing a transit line between the cities of Minneapolis and St. Paul. Justin Gabrielson, an Ames employee, was assigned as the project manager. On the first day of the project, Gabrielson remarked that "he had never worked with a female" assistant project manager, and he asked Liles if "she was going to cry on him." Over the next few months, Gabrielson made numerous comments[4] about Liles

_____

[3]Her task on this project was therefore confined to the maintenance role of oiling and greasing, rather than operating, the crane.

[4]The parties dispute the number of comments made. Viewing the evidence in the light most favorable to Liles, we conclude that the following events occurred. Gabrielson would "often" comment about how he thought Liles "was very good looking," and he made comments about her clothes such as "those jeans look nice" or "I like that shirt on you." Liles also claims that on one occasion Gabrielson "crawled on the floor and lifted her pants so he could see her high heels." Finally, Liles points to Gabrielson's action in December 2010 where she alleges he called a male Ames employee "a stupid f****** cowboy" in her presence.

being attractive and asked her on one occasion if she needed a hug. He would also stand in doorways with his arms stretched above his head in such a manner that his stomach was exposed and ask Liles if it aroused her. Liles testified that Gabrielson's inappropriate behavior ceased in February of 2011, and that she reported some incidents of Gabrielson's behavior to McCrossan the next month.[5]

Around the time that Liles began work on the CCLRT project, Manny Walk became her direct supervisor at CSM. As with Senior, Walk had a reputation for being a difficult supervisor. Walk became involved in the CCLRT project at some point early in 2011, and he quickly noticed that Liles was having difficulties fulfilling many of her job duties. In March, Gabrielson sent an email to Walk noting that Liles broke down in tears and that he felt she was "overwhelmed by the complexity of the job." McCrossan made similar remarks by email to Walk around that same time. As a result, CSM transferred Liles into a position performing field work—a transfer Walk described on April 28, 2011, as "allow[ing] Mandy the opportunity to gain field experience . . . [because] [w]e have recognized that Mandy's skill level is not yet at the position to assume all duties necessary for [the Project Controls role]." In an internal memorandum dated May 2, 2011, Walk described in detail a conversation he had with Liles the day after she was reassigned to the field. In response to a question from Liles during that meeting regarding why she had been removed from her original position, Walk "told her that it was mainly due to work product performance on the project and the inability to trust that she had the relevant skills needed . . . to meet the

---

[5]The parties also dispute the extent to which Liles reported Gabrielson's misconduct. In her brief, Liles claims to have "reported Gabrielson's sexual harassment and inappropriate behavior right away, and repeatedly, to Tom McCrossan." However, on the pages of her deposition that Liles cites in support of the above statement, Liles testified that she informed McCrossan about Gabrielson's behavior during a discussion they had on March 17, 2011. Given her additional testimony that Gabrielson's behavior ceased in February of that year, it is unclear how CSM could have corrected the behavior as it was occurring if Liles had failed to report it until a month after it had stopped.

demands of . . . being Assistant PM." Walk provided Liles with specific examples of deficient performance—including work being completed improperly or late and her failure to follow proper protocols on assignments—and Liles responded that this was the first she had heard about these issues. Walk further noted that he told Liles "that her success lies in her hands and this may be the last opportunity to move ahead in her role with [CSM]."

Liles's performance deficiencies followed her into her new position in the field. On her "satisfactory" performance review dated June 25, 2011, Walk wrote that no one calls Liles when they have problems, an issue he later described as being indicative of employees not trusting her ability to do her job. By email on November 8, 2011, Walk sent Liles a document titled "Performance Improvement Corrective Action" in which he stated that she was still failing to perform at an acceptable level with respect to many of the issues they had discussed in April and May. The document presented a Corrective Action Plan ("CAP") that required Liles to complete a number of assignments designed to test her ability to perform. Liles signed the document, but she also attached an addendum in which she attempted to refute or explain every performance issue raised by the CAP. The parties dispute whether she properly completed the plan. CSM terminated Liles on January 24, 2012.

Liles filed a charge of discrimination with the Equal Employment Opportunity Commission, which dismissed the charge and issued a right-to-sue letter on February 13, 2014. Thereafter, Liles filed suit in the United States District Court for the District of Minnesota alleging she experienced "Sex Harassment, Discrimination, [and] Retaliation" in violation of Title VII and "Sexual Harassment, Discrimination, [and] Reprisal" in violation of the Minnesota Human Rights Act (MHRA). After discovery, CSM moved for summary judgment on all six claims, and the district court granted this motion. The court first dismissed Liles's gender discrimination claims by assuming that she could establish her prima facie case, but finding that she had failed to show that CSM's proffered reason for her termination—her failure to

sufficiently perform her work duties—was pretext. Next, the court dismissed the harassment claims, concluding that Liles had failed to establish either that the complained-of incidents altered a term or condition of her employment or that the harassment was committed on the basis of her gender. Finally, the court dismissed the retaliation and reprisal claims because the two instances of protected conduct that occurred were too remote in time from the adverse action to support the causation element.

## II. Discussion

Because Liles appeals the district court's grant of summary judgment to CSM, our review is de novo. Guimaraes v. SuperValu, Inc., 674 F.3d 962, 971 (8th Cir. 2012). After viewing the facts in the light most favorable to Liles as the non-moving party, we will affirm if "there is no genuine dispute as to any material fact and [CSM] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In her notice of appeal, Liles challenges the district court's grant of summary judgment on all six of her original claims. However, in her brief, Liles does not make distinct arguments with respect to her claims for sexual harassment and gender discrimination under the MHRA.[6] At any rate, Minnesota generally follows the federal courts' analysis on these two subsets of claims, see Hervey v. Cnty. of Koochiching, 527 F.3d 711, 719 (8th Cir. 2016), so our disposition of these claims under Title VII decides any MHRA claims preserved for our review.

We first address Liles's claims of retaliation and reprisal before turning our attention to her claims of gender discrimination and hostile work environment.

---

[6]Liles clearly states that "[t]he district court erred by dismissing Plaintiff's Title VII and MHRA claims for retaliation/reprisal," and she cites authority from this circuit and Minnesota state courts in support of her arguments. On the other hand, Liles uses only the singular word "claim" in appealing her gender discrimination and sexual harassment claims, and she cites only federal precedent in those sections.

-6-

## A. Retaliation/Reprisal

Title VII forbids an employer from "discriminat[ing] against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). Likewise, the MHRA's counterpart to § 2000e-3(a) prohibits an employer from "intentionally engag[ing] in any reprisal against any person because that person . . . opposed a practice forbidden under this chapter or has filed a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter." Minn. Stat. Ann. § 363A.15(1).

A plaintiff may establish a retaliation or reprisal claim through direct or indirect evidence. See Musolf v. J.C. Penney Co., 773 F.3d 916, 918 (8th Cir. 2014). Where, as here, the plaintiff relies on indirect evidence, the McDonnell Douglas burden-shifting analysis applies. Id. Thus, Liles bears the burden of first establishing a prima facie case of retaliation by showing that "(1) she engaged in protected conduct; (2) a reasonable employee would have found the retaliatory action materially adverse; and (3) the materially adverse action was causally linked to the protected conduct." Id. After she establishes her prima facie case, the burden shifts to CSM "to articulate a legitimate, non-retaliatory reason for the adverse action." Id. at 918-19. Finally, the burden shifts back to Liles to offer evidence that CSM's proffered reason is pretext for retaliation. Id. at 919. This same framework applies to Liles's MHRA reprisal claim. Id. (citing Fletcher v. St. Paul Pioneer Press, 589 N.W.2d 96, 101-02 (Minn. 1999)).

In establishing her prima facie case, Liles relies primarily on two activities that she claims are protected.[7]  First, in 2010,[8] Liles reported to Tom McCrossan and several other CSM supervisors that Petry was not being given the training time she needed on the lattice boom crane.  Second, Liles reported Gabrielson's inappropriate comments and actions to Tom McCrossan in March 2011.  Next, Liles points to two adverse employment actions: being placed on the CAP in November 2011 and being terminated in January 2012.  Liles has therefore established the first two elements of her prima facie case.

Turning to the third element of the prima facie case, the Supreme Court's decision in University of Texas Southwestern Medical Center v. Nassar, 133 S. Ct. 2517, 2534 (2013), made clear that "[i]t is not enough that retaliation was a 'substantial' or 'motivating' factor in the employer's decision." Blomker v. Jewell, 831 F.3d 1051, 1059 (8th Cir. 2016) (quoting Vega v. Hempstead Union Free Sch. Dist., 801 F.3d 72, 90-91 (2d Cir. 2015)) (internal quotation marks omitted).  Rather, Title VII requires that "[r]etaliation must be the 'but for' cause of the adverse employment action." Blomker, 831 F.3d at 1059 (quoting Jackman v. Fifth Judicial Dist. Dep't of Corr. Servs., 728 F.3d 800, 804 (8th Cir. 2013)) (internal quotation marks omitted).  On the other hand, "[t]he Minnesota courts have not addressed . . . whether the Nassar but-for causation standard similarly applies for reprisal claims under the MHRA." Musolf, 773 F.3d at 919.  Although the Supreme Court of

---

[7]CSM does not dispute either of these activities' status as "protected." Therefore, for the purposes of this opinion, we assume without deciding that they are protected.

[8]It is unclear when exactly in 2010 this event occurred.  The district court noted that it happened "in late 2009 or early 2010," and Liles succinctly claims in her brief that it occurred "[i]n 2010."  But Liles then goes on to describe her start date on the CCLRT project as "the fall of 2010."  Viewing the facts in the light most favorable to Liles, we will assume that the latest date on which she could have complained about Petry's lack of training on the crane was some point in the summer of 2010.

-8-

Minnesota has offered differing articulations of the causation element, the most recent is that causation can be proven "by evidence of circumstances that justify an inference of retaliatory motive, such as a showing that the employer has actual or imputed knowledge of the protected activity and the adverse employment action follows closely in time." Dietrich v. Canadian Pac. Ltd., 536 N.W.2d 319, 327 (Minn. 1995) (quoting Hubbard v. U.P.I., Inc., 330 N.W.2d 428, 445 (Minn. 1983)) (internal quotation marks omitted).

Our Title VII precedent and Minnesota's MHRA precedent dispose of Liles's retaliation and reprisal claims. Her complaints regarding the discrimination against Petry occurred *at least* fifteen months prior to Liles being placed on the CAP and *at least* seventeen months before her termination. Her complaints regarding Gabrielson's inappropriate behavior occurred approximately eight months prior to Liles being placed on the CAP and approximately ten months before her termination. We have found causation lacking in instances where far less time passed between the protected activity and the adverse employment action. See, e.g., Kipp v. Mo. Highway & Transp. Comm'n, 280 F.3d 893, 897 (8th Cir. 2002) ("[T]he interval of two months between the complaint and Ms. Kipp's termination so dilutes any inference of causation that we are constrained to hold as a matter of law that the temporal connection could not justify a finding [of causation]."). Likewise, in Dietrich, the court determined that the MHRA causation standard was not satisfied when "several months" passed between the protected activity and the adverse action. 536 N.W.2d at 327.

With respect to the causation element, Liles asserts that Senior orchestrated a plan to have her placed on the CAP and ultimately fired out of spite. However, even accepting all of Liles's testimony recounting Senior's comments as true, only one of the comments could conceivably have anything to do with her gender. And Liles offers no evidence tying this comment to the adverse actions that occurred between ten and twelve months later. Cf. Guimaraes v. SuperValu, Inc., 674 F.3d 962, 972

(8th Cir. 2012) (dismissing retaliation claims in part because plaintiff could not correlate the employer's failure to follow its personnel policies with evidence of retaliation). This lack of evidence ultimately dooms her claim because the remainder of the evidence in the record demonstrates two things: First, that Liles's colleagues sporadically made abusive and harsh comments in an even-handed fashion regardless of the recipient's gender.[9] See Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998) (noting that Title VII standards will, if properly applied, filter out complaints alleging "sporadic use of abusive language, gender-related jokes, and occasional teasing" (internal quotation marks omitted)). And second, that she did, in fact, have a history of performance problems.

Liles seeks to bypass the fact that Senior and Walk were not decisionmakers by advancing, in substance, a "cat's paw" theory[10] through which she attempts to transfer the alleged animus on the part of Senior and Walk to the ultimate decisionmaker—Tom McCrossan. See Staub v. Proctor Hosp., 562 U.S. 411, 415, 419 (2011). In Dedmon v. Staley, 315 F.3d 948, 949-50 (8th Cir. 2003), we affirmed the district court's refusal to provide a cat's paw instruction because the plaintiff had failed to adduce sufficient evidence that the immediate supervisor "initiated,

---

[9]Liles herself provides the following examples. She observes that "the evidence show[s] that Sr. did not differentiate between men and women in the way he held grudges." "After one incident," Senior "refused [a male employee] work for two winters," and he made another male employee's "life hell" after a different disagreement. Likewise, Liles notes that "Walk had a general reputation as a difficult supervisor[] who could be mean as well as demanding." Finally, in her deposition, she commented that Gabrielson had a similar reputation: the other CSM employees on the CCLRT project "said they didn't like him" because "he was nitpicky," and she observed Gabrielson "belittl[ing]" a male assistant project manager.

[10]This phrase "describes a situation in which a biased subordinate, who lacks decisionmaking power, uses the formal decisionmaker as a dupe in a deliberate scheme to trigger a discriminatory employment action." Diaz v. Tyson Fresh Meats, Inc., 643 F.3d 1149, 1151 (8th Cir. 2011) (internal quotation marks omitted).

exercised, or even possessed any influence or leverage over" the ultimate decisionmaker. Further, we stated that "there [was] no evidence that [the supervisor] harbored any unlawful animus toward" the employee. Id. at 950. Here, Liles has produced evidence of comments by Senior that could infer discriminatory animus, and she has concluded that "Walk influenced Tom McCrossan's decision to terminate Liles." She has not, however, produced evidence that Senior had sufficient influence over McCrossan to cause him to fire her, nor has she produced evidence that Walk harbored a discriminatory animus. See Bennett v. Riceland Foods, Inc., 721 F.3d 546, 551 (8th Cir. 2013) ("In a cat's paw case, an employer may be vicariously liable for an adverse employment action if one of its agents . . . is motivated by discriminatory animus and intentionally and proximately causes the action.").

Finally, Liles repeatedly criticizes the district court for "evaluating Plaintiff's claims of discriminatory and hostile acts as discrete acts rather than an ongoing series of discriminatory acts." To that end, Liles cites National Railroad Passenger Corp. v. Morgan, 536 U.S. 101, 115 (2002), and a handful of other cases for the proposition that "[t]he 'unlawful employment practice' therefore cannot be said to occur on any particular day. It occurs over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own." What Liles fails to acknowledge is that these comments apply to hostile work environment claims which are, by their very nature, "based on the cumulative effect of individual acts." Id. In the retaliation context, however, "[d]iscrete acts such as termination, failure to promote, denial of transfer, or refusal to hire are easy to identify. Each incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable 'unlawful employment practice.'" Id. at 114.

As a result of the attenuated temporal proximity and the lack of evidence from which a jury could infer a discriminatory motive, Liles cannot establish the causation element of her prima facie case of retaliation and reprisal. The district court therefore correctly granted summary judgment to CSM on both claims.

-11-

B. Gender Discrimination

Liles also contends that the district court improperly granted summary judgment to CSM on her gender discrimination claim. Under federal law, an employer may not "discharge any individual, or otherwise . . . discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1). "The same analysis applies to both Title VII and MHRA claims." Guimaraes v. SuperValu, Inc., 674 F.3d 962, 972 (8th Cir. 2012). As with her retaliation claims, the McDonnell Douglas framework applies because Liles has presented no direct evidence of discrimination. See id. at 973. The district court assumed that Liles could establish her prima facie case and dismissed the claim because Liles failed to show that CSM's proffered nondiscriminatory reason—inferior job performance—was pretextual. We likewise assume she can establish her prima facie case of gender discrimination and solely determine whether Liles has shown sufficient evidence of pretext. See id. at 975.

Liles may show that CSM's reason for her termination was pretext for unlawful discrimination in a number of ways. In some instances, "[i]t is possible for strong evidence of a prima facie case to establish pretext." Smith v. Allen Health Sys., Inc., 302 F.3d 827, 834 (8th Cir. 2002). She could point to "[e]vidence that similarly situated employees outside [her] class were treated differently," but she has not done so. Lewis v. Heartland Inns of Am., 591 F.3d 1033, 1041 (8th Cir. 2010). She "may show that the employer's explanation is unworthy of credence . . . because it has no basis in fact." Torgerson v. City of Rochester, 643 F.3d 1031, 1047 (8th Cir. 2011) (en banc) (alteration in original) (internal quotation marks omitted). Finally, she also "may show pretext by persuading the court that a [prohibited] reason more likely motivated the employer." Id. (alteration in original) (internal quotation marks omitted). Liles's arguments on this point blend these latter two methods.

-12-

As to whether CSM's proffered reason had a legitimate basis in fact, "[t]he critical inquiry . . . is not whether the employee actually engaged in the conduct for which he was terminated, but whether the employer in good faith believed that the employee was guilty of the conduct justifying discharge." McCullough v. Univ. of Ark. for Med. Scis., 559 F.3d 855, 861-62 (8th Cir. 2009). Given CSM's explanation for the termination that Liles was inadequately performing her duties, Liles misses the mark in arguing that she was, in fact, satisfactorily performing her duties because "[t]hat proof shows only that the employer's belief was mistaken."[11] Pulczinski v. Trinity Structural Towers, Inc., 691 F.3d 996, 1003 (8th Cir. 2012). Rather, "[t]o prove that the employer's explanation was false," Liles needs to show that CSM did not actually believe that her performance was deficient. See id. This she has not done as she points to no evidence indicating that CSM's belief that she was not adequately performing her duties was insincere.

Liles next attempts to parlay her assertion that her performance was adequate into an argument that, because she was placed on the CAP shortly after a "satisfactory" review, there must be a discriminatory motive behind that action. Although the ultimate question in a discrimination case is necessarily whether gender or some other prohibited factor was *the* motivating factor prompting an adverse employment action, see Wright v. St. Vincent Health Sys., 730 F.3d 732, 739 (8th Cir. 2013), the appropriate inquiry "[a]t the summary judgment stage . . . is whether the plaintiff has sufficient evidence that unlawful discrimination was *a* motivating

[11]Liles entirely fails to acknowledge the many instances—both before and after she was placed on the CAP—reflected in the record where her supervisors indicated their lack of satisfaction with her performance. Instead, she repeatedly recharacterizes her "satisfactory" performance review scores into "more than satisfactory work" evidencing an "exemplary employment with CSM" without providing evidentiary support for these comments. Indeed, at every instance reflected in the record where a supervisor criticized Liles's work, her reply was, in effect, that she had no prior knowledge of the issue.

factor in the defendant's adverse employment action," <u>McCullough</u>, 559 F.3d at 860-61 (internal quotation marks omitted). "[E]vidence of a strong employment history . . . can be relevant when considering whether the record as a whole establishes a genuine issue of material fact." <u>Guimaraes</u>, 674 F.3d at 975 (alteration in original) (internal quotation marks omitted). For example, Liles cites our decision in <u>Turner v. Gonzales</u>, 421 F.3d 688 (8th Cir. 2005), in support of her assertion that her favorable history of employment at CSM must mean that "putting Liles on the CAP was itself an adverse employment action based on unlawful gender discrimination." But in that case, Turner "consistently earned performance ratings of 'Superior' or 'Exceptional'" over a twenty-year tenure with the FBI. <u>Turner</u>, 421 F.3d at 692. Less than a month after Turner reported a number of actions she believed were discriminatory, her performance rating was downgraded from "Superior" to "Minimally Acceptable/Unacceptable." <u>Id.</u> Therefore, given the sharp decline in her scores and the temporal proximity between that decline and her complaints, we held that this evidence supported an inference that the FBI's proffered reason was pretextual. <u>Id.</u> at 698. Here, by contrast, Liles has a history of "satisfactory" performance, and the evidence in the record shows that her supervisors and coworkers had on numerous occasions informed her of perceived deficiencies in her work. The district court thus properly dismissed Liles's gender discrimination claims.

## C. Sexual Harassment

Liles's final contention on appeal is that the district court erred in dismissing her claim of a hostile work environment. "Title VII prohibits employers from discriminating based on sex with respect to compensation, terms, conditions, or privileges of employment. Discrimination based on sex that creates a hostile or abusive working environment violates Title VII." <u>Jenkins v. Winter</u>, 540 F.3d 742, 748 (8th Cir. 2008) (internal quotation marks omitted).

"Hostile work environment harassment occurs '[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" Jackman v. Fifth Judicial Dist. Dep't of Corr. Servs., 728 F.3d 800, 805 (8th Cir. 2013) (alteration in original) (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993)). To establish her prima facie case, Liles "must prove: (1) she was a member of a protected group; (2) the occurrence of unwelcome harassment; (3) a causal nexus between the harassment and her membership in the protected group; (4) the harassment affected a term, condition, or privilege of employment; and (5) the employer knew or should have known of the harassment and failed to take prompt and effective remedial action." Jenkins, 540 F.3d at 748. "The standard for demonstrating a hostile work environment under Title VII is 'demanding,' and 'does not prohibit all verbal or physical harassment and it is not a general civility code for the American workplace.'" Jackman, 728 F.3d at 806 (quoting Wilkie v. Dep't of Health & Human Servs., 638 F.3d 944, 953 (8th Cir. 2011)).

The district court's analysis of this claim focused on elements three and four of the prima facie case. Even assuming that Liles satisfies the third element,[12] we find that she has failed to show that the harassment affected a term, condition, or privilege of her employment at CSM. This element presents "a high threshold," and Liles must prove that the environment was "both subjectively and objectively offensive." Sutherland v. Mo. Dep't of Corr., 580 F.3d 748, 751 (8th Cir. 2009). Liles "must prove the conduct was extreme in nature and not merely rude or unpleasant." Id. (internal quotation marks omitted). Our cases have consistently required much more severe and pervasive conduct than that alleged here. Anderson v. Family Dollar Stores of Ark., Inc., 579 F.3d 858, 862-64 (8th Cir. 2009) (affirming summary

_____

[12]This is an unlikely conclusion given the evidence in the record. See supra note 9 and accompanying text.

-15-

judgment in favor of the employer when the employee's supervisor rubbed the employee's shoulders weekly for a few months, called her "baby doll," implied that the employee would advance faster if she got along with him, and called her from Florida to tell her she should be in bed with him); Nitsche v. CEO of Osage Valley Elec. Coop., 446 F.3d 841, 843-44, 846 (8th Cir. 2006) (affirming summary judgment in favor of an employer where, over 20 years, a coworker made a myriad of sexual comments to and about the plaintiff, stuck a shovel between the plaintiff's legs and rubbed him with it, authored a belittling and sexually suggestive poem about the plaintiff, showed the plaintiff a Playboy magazine and a pornographic movie, and put snakes and mice in the plaintiff's lunch box); Ottman v. City of Independence, 341 F.3d 751, 755, 760 (8th Cir. 2003) (reversing the denial of a summary judgment and "conclud[ing] the district court erred in finding a triable issue for the jury" where a coworker made sexist and belittling comments to, about, and around the plaintiff "on a weekly, if not daily, basis").  Liles bases her claim on a number of comments and actions of Junior, Senior, and Gabrielson.  There is no doubt that these comments and actions were rude and unpleasant, but Liles fails to prove that they were so objectively and subjectively offensive that they altered the terms and conditions of her employment.  See Sutherland, 580 F.3d at 751.

Instead of bolstering her prima facie showing, Liles's course of action on appeal is to criticize a number of comments made by the district court.  First, she claims the district court incorrectly characterized the complained-of events as "stray incidents" rather than "a series of separate acts that collectively constitute one unlawful employment practice."  This argument fails because the collective effect of all of the conduct at issue is not sufficiently severe to establish a cognizable claim.  Liles then claims that only a jury can resolve "whether a reasonable woman in Liles' place would also find the environment in which she worked to be hostile based on these three individuals' actions."  Thus, in essence, she argues that the objective prong of whether there has been actionable harassment is a question of fact.  In response to a similar argument in Sutherland, we noted that we have never held "that

-16-

actionable harm must always be determined by a jury." 580 F.3d at 751. Indeed, the three cases discussed above—<u>Anderson</u>, <u>Ottman</u>, and <u>Nitsche</u>—all disposed of hostile work environment claims on motions for summary judgment. The district court properly granted summary judgment to CSM on Liles's hostile work environment claim.

## III. Conclusion

For the above reasons, we affirm the district court's grant of summary judgment to CSM.

_____