# IN THE COURT OF APPEALS OF IOWA

No. 16-2154
Filed September 27, 2017

**MICHAEL T. MANAHL,**
Plaintiff-Appellant,

**vs.**

**STATE OF IOWA,**
Defendant-Appellee.
_____

Appeal from the Iowa District Court for Polk County, Robert B. Hanson, Judge.

A former bureau chief in the Iowa Department of Agriculture and Land Stewardship challenges the grant of summary judgment for the State on his claim for wrongful discharge in violation of public policy. **AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

Thomas J. Duff of Duff Law Firm, P.L.C., West Des Moines, and Michael J. Carroll of Coppola, McConville, Coppola, Carroll, Hockenberg & Scalise, P.C., West Des Moines, for appellant.

Thomas J. Miller, Attorney General, and Jacob J. Larson and David S. Steward, Assistant Attorneys General, for appellee State.

Considered by Danilson, C.J., and Tabor and McDonald, JJ.

**TABOR, Judge.**

The Iowa Department of Agriculture and Land Stewardship (the department) fired Michael Manahl from his position as chief of the weights and measures bureau after only four and one-half months on the job. Manahl blames the firing on his pursuit of deceptive practices by a fuel company regulated by the department. Manahl sued the State, alleging wrongful discharge in violation of public policy and a whistleblower claim. The State successfully moved for summary judgment, insisting Manahl was let go because he did not meet his supervisor's expectations for managing staff time and scheduling annual gas-tank inspections and asserting Iowa's whistleblower statute does not protect disclosures of private wrongdoing. On appeal, Manahl only seeks reversal of the court's ruling on his wrongful-discharge claim. After viewing the record in the light most favorable toward Manahl, we find questions of material fact exist on Manahl's wrongful-discharge claim regarding the cause of his firing and the department's justification for its action. Accordingly, we affirm in part, reverse in part, and remand for a trial.

## I.      Facts and Prior Proceedings

On October 12, 2012, Steve Moline, director of the consumer protection and industry services division of the agriculture department, hired Manahl as chief of the weights and measures bureau.[1] The bureau's mission is to check

---

[1] We glean this background information from "undisputed" facts in the summary judgment record, including pleadings, affidavits, and depositions. In support of its summary-judgment motion, the State filed a statement listing 153 "undisputed" facts. Manahl disputed or qualified the vast majority of those facts in his resistance. Our recitation of the facts attempts to highlight where a point remains in dispute.

"gas pumps and scales . . . to affirm that they are accurate," according to the deposition testimony of Iowa Secretary of Agriculture Bill Northey.

Manahl testified that upon starting work, he "was informed that we needed to ensure that all the fuel meters were inspected annually, and there was some question on what staff was doing what, when, and where, to ensure that was done." After about three weeks on the job, Manahl distributed a spreadsheet to staff members to help them track their time each week and record how many inspections they could complete. He shared the proposed itinerary tracking sheets with his boss, Moline, on October 29, 2012.[2] During his first few months of work, Manahl met regularly with Moline and did not recall Moline expressing any concerns about Manahl's job performance.

In late November 2012—about six weeks into Manahl's tenure as chief—one of the bureau's fuel inspectors discovered what he believed to be mislabeling of the octane rating of a product sold at two different prices by Molo Petroleum, a fuel company doing retail business as Big 10 Marts. The inspector found fuel containing 9.7% ethanol in both the E87 and E89 tanks—"priced $3.29 on E87 buttons and $3.39 on E89 pumps." Manahl discussed the findings with Molo general manager Glen Hasken, who insisted the practice met minimum standards set by state law and the Federal Trade Commission. Manahl questioned whether Molo was misrepresenting prices and suspected the practice amounted to consumer fraud. Hasken voiced his irritation with Manahl's belief

---

[2] According to Moline's affidavit, Manahl did not have his employees begin using the forms until the end of December 2012. In addition, Manahl did not complete a plan for gas-pump inspections until mid-February 2013, when Manahl sent his staff "fuel meter assignment" maps to help track their inspections.

Molo was committing a pricing violation to John Maynes, a lobbyist with the Petroleum Marketers and Convenience Stores of Iowa (PMCI), a trade association representing fuel retailers.

The pricing matter was the subject of a meeting on December 12, 2012. The participants were Manahl, Hasken, and Maynes. Hasken explained Molo's pricing discrepancy was "a market test" in an effort to be competitive with other retailers "across the bridge in Illinois." Hasken questioned why the bureau of weights and measures cared about the price at which Molo sold its product. Manahl responded: "[W]e are not telling you what you can sell it at, but you should not be selling the 'same' product at two different prices." Although not admitting any wrongdoing, Hasken said his company had discontinued the practice.

On December 14, 2012, Manahl drafted a letter to Hasken alleging possible violations of the state administrative code regarding fuel-rating rules and multi-tier pricing. The letter asked Molo to "cease" the practices immediately. Also as part of his research into the fuel-pricing issue, Manahl contacted an investigator with the Iowa Attorney General's Office on December 20, 2012.

Before sending the letter, Manahl discussed the draft with Moline, who told him to do further investigation. According to Moline's affidavit, he advised Manahl that the allegations concerning mislabeling and pricing violations fell into a "gray area" of the law and asked him to delete such accusations from the letter. Manahl also recalled Moline advising him not to contact the Iowa Attorney General's Office about the allegations but, rather, to go through "proper

channels" within the agriculture department. Manahl received Moline's approval to send a revised letter to Hasken in late December 2012.

Just as the pricing issue seemed to subside, a new concern arose at a Big 10 Mart in Bettendorf. On December 28, 2012, the weights and measures bureau received several "bad gas" complaints from customers whose cars stalled after buying Molo fuel. Molo identified the problem as "phase separation" related to water in the fuel storage tank. Manahl gave an interview to a Quad Cities television station on the "phase separation" issue on January 2, 2013. Manahl also discussed Molo's pricing practices with the reporter. According to Hasken's affidavit, after the news story aired, "Molo began receiving a substantial amount of negative feedback and backlash in the local press and on social media about the pricing of Molo's gasoline."

On January 11, 2013, Hasken wrote an email to Maynes referencing Manahl's television interviews:

> Check out our media darling with weights and measures. This is the third story that he has done with this news station regarding a simple case of phase separation. Now he leaked to them . . . the same-product-being-sold issue. As far as I am concerned this is war. This guy is out of touch and out of control. None of his information is factual. Something needs to be done with this guy.

In mid-January 2013, Hasken expressed his frustrations with the weights and measures bureau directly to Secretary Northey. According to Hasken's affidavit, Northey said he would "have his office look into the matter." Over the next few weeks, Hasken and Moline had several phone conversations and email exchanges in which Hasken vented about "W&M Bureau's handling of its investigation into Molo and Manahl's statements to the news media." Hasken

demanded "a written public apology for the negative impacts Molo suffered because of the false news media coverage instigated by Manahl's false and misleading public accusations."

PMCI lobbyist Maynes also recalled having at least five telephone calls with Moline during this time period. Maynes testified at his deposition he was "hoping to find a resolution to the matter that was satisfactory for Glenn [Hasken]" because the pricing issue was "starting to take up an awful lot of time." Maynes also obtained information on the inner workings of the weights and measures bureau, having learned from one of Manahl's employees that Manahl had been making inspectors "work hours that they're not required to work and may have taken some liberties with a handbook issue."

Moline told Manahl that Secretary Northey had been "cornered at a fundraiser" by fuel-industry representatives who questioned why the bureau was "investigating them and dragging them through the mud." In regard to the interview, Moline told Manahl his statements to the reporter were not factually inaccurate but he shouldn't have been talking to the media.

In addition to the Molo controversy, Manahl was running into difficulties managing his staff in January and February 2013. In his deposition, Manahl testified that in January 2013, he learned Randy Watts, chief of the commercial-feed-and-fertilizer bureau, was "going to all [of] the sudden be a mentor to me." In his deposition, Moline testified he wanted Watts to help Manahl "focus on the tasks that we had identified as priority." Manahl met with Watts once or twice a week to receive "some guidance" on personnel issues. Manahl did not perceive the mentor arrangement as a signal Moline was concerned with Manahl's job

performance. Watts's deposition testimony described his understanding of the mentoring strategy: "Plan A was Mike Manahl gets better. Plan B was Mike Manahl doesn't get better, and I would serve as an interim bureau chief only because I was familiar with the goings-on and the personnel." Moline and Watts acknowledged they did not document any of Manahl's later-alleged shortcomings as bureau chief.

Manahl did receive feedback from Moline in February that Manahl should not be using staff time to review drafts of a safety manual. Rather, Moline stressed conducting timely fuel inspections should be the bureau's priority.

On February 8, Manahl memorialized an insubordination warning he issued to one of his fuel-quality inspectors. The employee responded in a memorandum that included the following assertion: "Yelling, door slamming, and excessive tension are anticipated anymore with every visit to the Ankeny Lab.[3] I feel like I'm walking into a hostile work environment and experience anxiety as to whether or not those hostilities will be directed at me." On February 20, Moline asked a human-resource associate to send both documents to the Iowa Department of Administrative Services.

Meanwhile, the drama with Molo continued. In discussing the fuel-pricing issue with Manahl, Moline asked what Manahl's "ultimate goal was and what did [he] want Molo to do." Manahl responded that Molo "should stop this practice, this is fraud, this is wrong." Moline then told Manahl that Molo wanted a

---

[3] The weights and measures bureau, headed by Manahl, was housed in Ankeny, while the department's administrative offices were located at the capitol complex in Des Moines.

"retraction letter" and Moline planned to accommodate the request by revising Manahl's original letter.

On February 6, Jeff Hove, vice president of PMCI, wrote an email to PMCI president Dawn Carlson and Maynes expressing the following sentiment: "Our relationship with this department is going downhill as it appears that IDALS bureau chiefs are on a witch-hunt in the field . . . ." The email also discussed Hasken's ongoing feud with the weights and measures bureau: "Glenn is looking for a written apology or some other form of internal IDALS reprimand for staff based upon a recent altercation between Molo and IDALS."

On February 15, 2013, Hasken, Maynes, and Hove met with Moline at the PMCI office. Hasken recalled, "Moline indicated that Secretary Northey and his staff understood why Molo was upset about the media coverage." Moline also said "he would need to speak with Secretary Northey about whether an apology would be given." After the meeting, Hasken told the company owner, Mark Molo: "I got the impression that Mike Manahl does not survive this deal." In his deposition, Maynes gave this impression of the meeting with Moline:

> I think Steve [Moline] believed that some of the issues had been mismanaged . . . by Mike [Manahl], but [Moline] also felt like the pricing issue was a gray area and an area that he wasn't confident that they could go forward with anything against Molo, but he certainly wasn't comfortable with it from a consumer standpoint.

Maynes testified there was not any discussion "directly about Mike's job status," but in the meeting, Steve said "'there are things going on within the bureau that I cannot and I will not discuss,' and knowing Steve and knowing Steve's position, that statement caught my attention. [Steve] was also adamant that he wasn't going to expand on that any further."

On February 21, Hasken sent Moline an email demanding the department retract Manahl's December 29, 2012 letter and send a new letter stating Molo's practices were not in violation of the law and apologizing for "any inconvenience or grief Molo suffered" as a result of the original communication.

During a February 26 telephone conversation, Moline told Maynes that he should expect another call on Friday morning, March 1, with information unrelated to the retraction letter.

On February 28, less than two weeks after Moline met with Hasken and Maynes, Moline fired Manahl. Moline did not mention the issues with Molo while telling Manahl he was being let go. The termination letter signed by Moline stated Manahl had "unsuccessfully completed his probationary period." Manahl reported receiving "no negative reviews, performance evaluations, or other assessments" before his termination. Moline testified to consulting with the Iowa Department of Administrative Services concerning terminating employees before they move into "the protected merit class" after six months on the job: "I was instructed that for God sakes if you have any doubt don't go beyond the probationary period."

On the same day as the firing, February 28, Moline acted on Molo's request and issued a replacement letter to Hasken on behalf of the department. While the new letter did not contain an apology, Hasken's affidavit stated: "[O]verall, Molo was satisfied with the replacement letter." On March 1, the next day, Hasken learned about Manahl's firing. Hasken averred he "never asked" the department to fire Manahl and was "not aware of any such request by any other Molo representative." On March 13, Hasken, Mark Molo, Moline, and

Secretary Northey held a conference call focused on "mend[ing] the relationship" between the company and the department. In his affidavit, Maynes confirmed, after Manahl's firing, the pricing issue never came up again.

In December 2014, Manahl filed a lawsuit alleging five claims against the State related to his firing. The State moved to dismiss, alleging Manahl failed to state any claim upon which relief could be granted. The district court dismissed all but two counts: a whistle-blowing claim under Iowa Code section 70A.28 (2014), and an allegation of wrongful termination in violation of public policy.

In July 2016, the State moved for summary judgment on those remaining counts, filing a supporting brief and a statement of undisputed facts. The following month, Manahl filed a resistance and response to the State's statement of undisputed facts. The district court heard arguments on the State's motion in early September. In December 2016, the district court granted summary judgment as to both counts of the petition. Manahl appeals the court's ruling, but he advances an argument and seeks relief only on his wrongful-discharge claim.

## II.    Scope and Standard of Review

"Because this case reaches us on appeal from a summary judgment ruling, our task is to review the record made before the district court to determine whether a genuine issue of material fact is in dispute . . . ." *Walls v. Jacob N. Printing Co.*, 618 N.W.2d 282, 284 (Iowa 2000). We review the grant of summary judgment for correction of legal error. *See Plowman v. Fort Madison Cmty. Hosp.*, 896 N.W.2d 393, 398 (Iowa 2017).

Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.

Iowa R. Civ. P. 1.981(3). We view the summary-judgment record in the light most favorable to the nonmoving party and will grant that party all reasonable inferences that we can draw from the record. *See Estate of Gray ex rel. Gray v. Baldi*, 880 N.W.2d 451, 455 (Iowa 2016). "The burden is on the party moving for summary judgment to prove the facts are undisputed." *Phillips v. Covenant Clinic*, 625 N.W.2d 714, 717 (Iowa 2001). "Even when the facts are undisputed, summary judgment is inappropriate if reasonable minds could draw different inferences from those facts." *Frontier Leasing Corp. v. Links Eng'g, LLC*, 781 N.W.2d 772, 775–76 (Iowa 2010). We are also mindful that the district court must not reach credibility determinations in granting summary judgment; assessments of what evidence to believe are left to the trier of fact. *See id.* at 776.

## III. Was Summary Judgment an Appropriate Resolution to Manahl's Claim of Wrongful Discharge?

Manahl was an at-will employee. Our supreme court created a judicial remedy for the discharge of an at-will employee "for reasons deemed to be contrary to public policy." *See Springer v. Weeks & Leo Co.*, 429 N.W.2d 558, 560 (Iowa 1988).[4] The tort of wrongful discharge in violation of public policy requires an employee to prove three elements: (1) the existence of a clearly defined and well-recognized public policy that protects the employee's activity

---

[4] At-will employment means that either the employee or the employer may end the arrangement at any time, for any reason, or for no reason whatsoever. *Jones v. Univ. of Iowa,* 836 N.W.2d 127, 144 (Iowa 2013). Although the State highlights the fact Manahl had not finished his initial six months of state employment when fired, his probationary status does not diminish his protection under *Springer.* The wrongful-discharge tort applies equally to probationary and non-probationary at-will employees. *Cf. Davis v. Horton*, 661 N.W.2d 533, 536 (Iowa 2003) (applying elements of discharge in violation of public policy to employee placed on probationary status as disciplinary measure).

(the clarity element); (2) firing the employee under the circumstances alleged would undermine the public policy (the jeopardy element); and (3) the challenged firing resulted from the employee's participation in the protected activity (the causation element). *See Fitzgerald v. Salsbury Chem., Inc.*, 613 N.W.2d 275, 281, 282 n.2 (Iowa 2000); *see also Rivera v. Woodward Res. Ctr.*, 865 N.W.2d 887, 898 (Iowa 2015) (clarifying that fourth element suggested in *Fitzgerald* footnote, i.e., employer lacked overriding business justification for dismissal (the absence-of-justification element), is not a requirement of plaintiff's case— "[p]laintiffs are rarely required to prove a negative"). The first two elements present questions of law for the court to resolve. *Fitzgerald*, 613 N.W.2d at 282. They are not in dispute here. In rejecting the State's motion to dismiss the wrongful-discharge claim, the district court held the statutes and regulations concerning petroleum retailers identified by Manahl met the clear public-policy test (the clarity element). On appeal, the State does not contest that holding or that discharging an employee for investigating deceptive practices within his regulatory duties would undermine that public policy (the jeopardy element).

We focus on causation. "The causation standard is high" and requires us to determine if a reasonable fact finder would conclude Manahl's pursuit of the Molo matter was the determining factor in the decision to fire him. *See Fitzgerald*, 613 N.W.2d at 289; *see also Rivera*, 865 N.W.2d at 898 (defining "determining factor" as "one that tips the balance in an employment decision").[5]

---

[5] The Iowa Supreme Court recently adopted a "unified approach" to status-based and retaliation causation, concluding the motivating-factor or played-a-part test applies to both claims under the Iowa Civil Rights Act (ICRA). *Haskenhoff v. Homeland Energy Sols., LLC*, 897 N.W.2d 553, 635-37 (Iowa 2017) (Appel, J., specially concurring for a

The employee's protected conduct does not need to be the main reason behind the adverse employment decision, but it must be the factor that makes a difference in the outcome. *See Davis*, 661 N.W.2d at 536 (analogizing determining factor to the "final straw" in employer's decision to terminate plaintiff's employment). Although Manahl is not required to prove his employer lacked an overriding business justification for his firing, the employer's legitimate business reasons for the action are relevant to counter Manahl's evidence inferring his protected conduct was the determining factor in the firing. *See Rivera*, 865 N.W.2d at 898–99 (noting jury instructions on "causation are sufficiently broad to allow an employer to make the case that the legitimate business reasons, and not the protected conduct, were the determining factor in the employment decision").

In granting summary judgment for the State, the district court concluded Manahl "failed to create a genuine issue of material fact as to whether his participation in a protected activity was the reason he was terminated." On appeal, Manahl contends this conclusion as to causation was the product of impermissible credibility determinations from disputed facts in the record. He asserts: "A reasonable fact-finder, drawing all inferences in light most favorable to Manahl, could easily conclude that Manahl was sacrificed to appease Molo and Hasken."

---

majority of the court). In the *Haskenhoff* majority decision, Justice Waterman noted the Iowa Supreme Court had "frequently compared tortious discharge under common law and retaliatory discharge under the ICRA, as the two have traditionally possessed similar elements and causation standards." *Id.* at 583. But *Haskenhoff* does not purport to change the determining-factor causation standard for the common-law claim. *See id.* at 635–37.

In response, the State defends the grant of summary judgment, contending the district court properly found "the undisputed material facts demonstrated that the determining factor for Manahl's discharge was the opinion of both his supervisor and co-workers that he failed to meet [the department's] expectations, and he was discharged before his status changed from probationary to permanent." The State further urges "[t]he undisputed facts demonstrate that Manahl has failed to meet his burden to establish that the State's articulated legitimate, non-retaliatory reasons for termination of Manahl's employment were mere pretext."

Without directly discussing whether it is appropriate to employ a burden-shifting paradigm here, the State's brief uses language derived from *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–03 (1973).[6] Despite those allusions in the State's brief, it does not appear our supreme court has "squarely addressed" the question whether a burden-shifting analysis applies to common-law wrongful-discharge claims. *See Brown v. Farmland Foods, Inc.,* 178 F. Supp. 2d 961, 979 n.7 (N.D. Iowa 2001) (noting Iowa Supreme Court had not "ruled directly on the question of whether common-law retaliation claims are subject to the *McDonnell Douglas* burden-shifting paradigm"). But in *Brown*, a federal district court predicted it was "highly likely" the Iowa Supreme Court

[6] Where a plaintiff relies on indirect evidence to establish a statutory employment-discrimination claim, the *McDonnell Douglas* burden-shifting analysis applies. *See Liles v. C.S. McCrossan, Inc.*, 851 F.3d 810, 818 (8th Cir. 2017). The plaintiff bears the burden of first establishing a prima facie case of retaliation by showing (1) he engaged in protected conduct; (2) a reasonable employee would have found the retaliatory action materially adverse; and (3) the materially adverse action was causally linked to the protected conduct. *Id.* After the plaintiff establishes his prima facie case, the burden shifts to the employer to articulate a legitimate, non-retaliatory reason for the adverse action. *Id.* Finally, the burden shifts back to the plaintiff to offer evidence the employer's proffered reason is pretext for retaliation. *Id.*

would apply the same burden-shifting analysis to common-law claims as it applied to statutory retaliatory-discharge claims. *See id.* at 979.

In the sixteen years since the federal court's prediction in *Brown*, our supreme court has not confirmed that Iowa applies the *McDonnell Douglas* analysis to summary-judgment motions in wrongful-discharge tort claims.[7] *See generally Jones*, 836 N.W.2d at 144, 147 (discussing *McDonnell Douglas* framework only for race and gender discrimination claims, not for common-law wrongful discharge claim); *Davis*, 661 N.W.2d at 536 (affirming summary judgment on causation grounds, finding protected conduct was not "final straw" in employer's decision to terminate plaintiff's employment and not applying burden-shifting framework). Without direction from our supreme court that burden shifting is proper in this kind of tort case, we decline to work within the *McDonnell Douglas* framework suggested by the State's argument for summary judgment.[8]

The question before us is whether Manahl has introduced sufficient evidence from which a rational trier of fact could find his protected conduct was the determining factor—in other words, the tipping point—for Moline's decision to terminate his employment. *See Teachout v. Forest City Cmty. Sch. Dist.*, 584 N.W.2d 296, 302 (Iowa 1998) ("A factor is determinative if it is the reason that

---

[7] The *McDonnell Douglas* analysis is not necessary once a case has proceeded to trial because the plaintiff ultimately bears the burden to show the adverse employment action resulted from discrimination. *Farmland Foods, Inc. v. Dubuque Human Rights Comm'n,* 672 N.W.2d 733, 741 n.1 (Iowa 2003).

[8] We disagree with the assumption in *Brown* that the burden-shifting paradigm works interchangeably in both statutory and common-law employment claims. 178 F. Supp. 2d. at 979. The higher burden of causation imposed on employees in wrongful-discharge claims may account for our supreme court's decision not to embrace *McDonnell Douglas* in the tort context. Once the employee creates a fact question on the determining cause of the employer's adverse employment action, it would be confusing to require the employee to offer additional evidence that the employer's articulated rationale for the act was a pretext for violating a recognized public policy.

'tips the scales decisively one way or the other,' even if it is not the predominant reason behind the employer's decision." (citation omitted)). At this early stage in the proceedings, it is important to remember that we must view the facts in a light most favorable to Manahl and afford him all legitimate inferences the record will bear. *See Smidt v. Porter*, 695 N.W.2d 9, 15 (Iowa 2005).

The State is adamant that Moline's decision to fire Manahl resulted from Manahl's failure to meet department expectations in regard to managing the employees in the weights and measures bureau and dispatching them to timely inspect gas tanks across Iowa. This purported rationale for the firing finds some footing in the summary-judgment record. Manahl was slow to implement the weekly-itinerary tracking sheets and fuel-meter assignment maps he developed to coordinate his employees' inspections. He also may have been misdirecting employee time toward developing a redundant safety manual. And the record includes employee complaints, though disputed, about the aggressive nature of Manahl's management style. But the State did not offer any contemporaneous written documentation from Moline or any other manager of Manahl's alleged deficiencies on the job. *See id.* at 15–16 (holding "a trier of fact could choose not to believe [the employer's] after-the-fact justifications" where the employer failed to produce documentation of poor performance).

Ultimately, the State's legitimate-business-reasons argument calls for fact finding. *See Rivera*, 865 N.W.2d at 899 ("Indeed an employer will prevail if it convinces the fact finder that the legitimate business reasons supporting the action were so strong as to defeat the conclusion that the protected conduct was the determining factor in the adverse employment decision."). By moving for

summary judgment, the State is asking the courts to decide, *as a matter of law*, that Manahl's pursuit of Molo was not the determining factor in his firing. In other words, the State is arguing that no genuine, disputed issue of fact exists that Moline would have terminated Manahl's employment on February 28, 2013, regardless of whether Manahl had antagonized Hasken by investigating Molo's pricing practices.

Even if we assume the State articulated legitimate reasons for not keeping Manahl as bureau chief beyond the six-month probationary period, those reasons do not defeat—as a matter of law—Manahl's claim that his investigation of Molo's pricing practices was the determining factor in his firing. While the department may not have been fully satisfied with Manahl's performance, Manahl still deserves a chance to have a trier of fact assess whether the aggravation that Manahl's enforcement efforts caused fuel-industry representatives, which they forcefully communicated to his bosses, was the straw that broke the camel's back. *See Barkey v. Vetter Health Servs., Inc.*, No. C15-34-LTS, 2016 WL 3948069, at *7 (N.D. Iowa July 19, 2016) (denying motion for summary judgment because employer did not show there was no genuine, disputed issue of fact it would have discharged employee regardless of his protected conduct).

The district court found: "The undisputed material facts demonstrate Moline was supportive of Manahl's investigation and never attempted to appease Molo or PMCI." We disagree with this reading of the summary-judgment record. Fair inferences exist in the record that Moline was not enthralled with Manahl's quest to prove Molo was committing consumer fraud. For instance, Moline directed Manahl to revise the initial letter to Hasken because Moline considered

the potential pricing violations a "grey area" of the law. Moline later personally redrafted the letter to Hasken, retracting the initial allegations and sending a less forceful message.

In addition, the State concedes for the purpose of the summary-judgment proceedings that Moline shut down Manahl's conversations with investigators in the Attorney General's Office on the fuel-pricing issue, directing him instead to follow the chain of command in the Iowa Department of Agriculature. Moline informed Manahl the department, even Secretary Northey, was getting heat from fuel-industry representatives concerning the inquiry by the weights and measures bureau into Molo's practices. Moline fielded multiple calls from these representatives and met with them at the PMCI office without Manahl present. At that meeting, Moline hinted that a personnel decision would be forthcoming. It was undisputed Hasken was irate about Manahl's actions and wanted an apology from the department. Whether Manahl's firing was an alternative means to placate Hasken and PMCI remains a fact question for trial. *See Fitzgerald*, 613 N.W.2d at 282 (explaining that element of causation is inherently factual in nature and "generally more suitable for resolution by the finder of fact").

The State stresses the timing of Manahl's firing, without more, is insufficient proof to survive summary judgment. *See Teachout*, 584 N.W.2d at 302; *Phipps v. IASD Health Servs. Corp.*, 558 N.W.2d 198, 203 (Iowa 1997). The evidence in the instant case is not as barebones as the plaintiffs' evidence in *Teachout* and *Phipps*. In *Teachout*, the evidence only established the employee's termination occurred *after* the school district learned she had engaged in a protected activity and the employee also conceded she had a

"personality conflict" with the supervising teacher. 584 N.W.2d at 302–03. In *Phipps*, the plaintiff conceded he had no evidence to support his retaliation claim *other than* the fact he was let go about one month after filing a grievance. 558 N.W.2d at 203.

Here, by contrast, the timeline of events generates a fair inference that Manahl's protected conduct led to his firing. *See Smith v. Allen Health Sys., Inc.*, 302 F.3d 827, 833 (8th Cir. 2002) (noting "the length of time between protected activity and adverse action is important"). In finding the temporal connections in the case to be "unpersuasive," the district court noted Manahl's firing came almost three months after his initial disclosures about Molo's pricing practices and seven weeks after his media interviews on the subject. But those dates do not tell the whole story. About six weeks before Manahl was fired, the fuel-industry representatives took their grievance directly to Secretary Northey. During late January and early February 2013, PMCI's Maynes barraged Moline with emails and calls on the Molo issue. At the February 15 confab between Moline and fuel-industry representatives, lobbyist Maynes recalled Moline placing a "self-imposed two-week deadline to have the issue over and done with."

True to that deadline, on February 28, Moline fired Manahl. On the same day as the firing, Moline sent the watered-down letter to Hasken. And although the letter did not include the apology Hasken had requested, Hasken was nevertheless satisfied. Less than two weeks after Manahl's firing, Secretary Northey and Moline participated in a conference call with Molo officials to mend fences. The steady drumbeat of industry pressure for some kind of action concerning the weights and measures bureau—coinciding with Manahl's

termination while more than six weeks remained in his probationary period—creates a genuine issue of material fact concerning whether an inference existed that Manahl was fired for his regulatory efforts.

The differing inferences to be drawn from the evidence in this case preclude summary judgment. *See Fitzgerald*, 613 N.W.2d at 289 (reversing summary judgment, finding "existence of other justifiable reasons for the termination" was for the jury); *see also Tekippe v. State*, No. 10-0464, 2011 WL 768659, at \*4 (Iowa Ct. App. Mar. 7, 2011) (reversing summary judgment and finding former state employee offered sufficient evidence to generate an issue of material fact on the causation element).

Because the record surrounding Manahl's firing does not affirmatively establish there is no genuine causation issue for trial on his wrongful-discharge claim, the district court erred in granting summary judgment in favor of the State on that claim. We accordingly affirm summary judgment on the whistleblower claim, reverse the grant of summary judgment on the wrongful-discharge claim, and remand for further proceedings.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**