# IN THE COURT OF APPEALS OF IOWA

No. 19-0373
Filed May 13, 2020

**CHAYSE HOLDINGS, LLC, an Iowa Limited Liability Company,**
     Plaintiff-Appellant,

**vs.**

**GARY TOFT, GREG TOFT, and RENEE TOFT,**
     Defendants-Appellees.
_____

**GARY TOFT, GREG TOFT, and RENEE TOFT,**
     Counterclaim Plaintiffs,

**vs.**

**CHAYSE HOLDINGS, LLC,**
**An Iowa Limited Liability Company,**
     Defendant to Counterclaim.
_____

Appeal from the Iowa District Court for Dickinson County, Nancy L. Whittenburg, Judge.

A buyer appeals from the district court's ruling denying specific performance of a real estate contract and awarding the sellers the deposited earnest money. **AFFIRMED.**

Jeffrey Egge of Wilson & Egge, P.C., Waukee, and Thomas W. Lipps of Peterson & Lipps, Algona, for appellant.

Edward W. Bjornstad of Bjornstad Law Office, Spirit Lake, for appellees.

Considered by Bower, C.J., and Greer and Ahlers, JJ.

**BOWER, Chief Judge.**

A buyer appeals from the district court's ruling denying specific performance of a real estate contract and awarding the sellers the deposited earnest money, contending the trial court incorrectly interpreted the real estate contract. Finding no error, we affirm.

**I. Background Facts and Proceedings.**

Plaintiff Chayse Holdings, LLC (hereinafter referred to as Buyer) is an Iowa limited liability company with its principal place of business located in Clive, Iowa. Tobis Torstenson is the manager and owner of Buyer.

Defendants Greg Toft, Renee Toft,[1] and Gary Toft (hereinafter referred to as the Tofts) own lakefront property on Lake Okoboji commonly referred to as 1209 Maywood Avenue.

On September 17, 2016, Buyer entered into a real estate contract with the Tofts for the purchase of 1209 Maywood Avenue, a vacant and unimproved lake-front property, for the purchase price of $850,000 with a specified closing date of December 17, 2016, at 5:00 p.m. The contract was prepared by Buyer's agent, Jaime Niblo of Chayse Holding Broker Services (an entity also owned by Torstenson). Under the contract terms, Buyer paid earnest money in the sum of $1000.00 to be held in trust with the Tofts' real estate agent EXIT Realty-Midwest (EXIT). Brad Sanderson is the owner of EXIT. Other pertinent terms included:

A checked box by the section: "**CASH** to be paid on settlement date. This offer is not contingent upon Buyer obtaining financing. Seller has the right to

---

[1] Renee and Greg are married.

receive immediate verification of funds." The other available options of that provision, which were *not* checked included "new mortgage," "assumption of mortgage or contract," and "installment contract." Though "other terms/contingencies" were not checked, the following was provided, "Buyer has [sixty] days due diligence. After due diligence is removed, buyer will close within [thirty] days." Handwriting then appears, "$30,000 non-refundable down immediately after due diligence period is up," and the initials GT GT TT.[2]

The contract also included the following pertinent provisions:

**(1) TRUST PAYMENTS.** All funds deposited as part payments shall be held by EXIT Realty-Midwest in trust pending acceptance of this offer, and examination of the abstract and delivery of deed or formal contract.

. . . .

**(3) CLOSING AND POSSESSION.** Closing shall be on or before 5:00 p.m. December 17th, 2016 and be made upon delivery of an instrument of title, but not later than date of possession, unless an interim occupancy agreement is entered into between the parties. Closing to be under the supervision of Seller's Agent, Tanner Perrigo. Possession to be given December 17th, 2016, and adjustment of interest, taxes, insurance and rents to be made on this date.

. . . .

**(13) REMEDIES OF THE PARTIES—FORFEITURE—FORECLOSURE—REAL ESTATE COMMISSIONS.**

(a) If Seller fails to fulfill this agreement, Buyer shall have the right to have all payments returned or to proceed by an action or actions at law or in equity.

(b) If Buyer fails to fulfill this agreement, all payments by Buyer may be forfeited and retained by Seller as provided in the Iowa law.

(c) In addition to the foregoing remedies, Buyer and Seller each shall be entitled to any and all other remedies, or action at law, or in equity, including foreclosure, and the party at fault shall pay costs and attorney fees, and a receiver may be appointed.

. . . .

**(16) DEED.** Upon payment of purchase price, Seller shall convey title by general warranty deed . . . free and clear of liens and

---

[2] Throughout the contract initials were added; TT indicated Buyer (presumably Tobis "Toby" Torstenson) and GT indicated sellers (Greg Toft and Gary Toft).

encumbrances, or future mechanics liens or encumbrances due to the responsibility and possession of the Seller(s), reservations, exceptions or modifications except as the instrument otherwise expressly provides. . . .

**(17) GENERAL PROVISIONS.** In the performance of each part of this agreement, time shall be of the essence. . . .

**(18) NOTICE.** Any notice required under this Agreement shall be deemed delivered when it is received or provided either by hand delivery, facsimile, electronic communication or certified mail. . . . Electronic or facsimile transmission sent to the other party or to the appropriate Broker, followed by electronic or faxed acknowledgment of receipt, shall constitute delivery of signed document.

. . . .

**(23) ACCEPTANCE.** When accepted, this offer shall become a binding contract for the sale and purchase of the above described property and the professional service fee(s) shall be due to the Agent(s) in accordance with the Exclusive Listing Agreement, Buyer Agency Agreement or other written commission agreement, between either party and their Agent(s).

. . . .

**THIS IS A LEGALLY BINDING CONTRACT.** If not understood, consult with the lawyer of your choice. [Torstenson's, Greg Toft's, and Gary Toft's signatures appeared below.]

On November 17, 2016, the parties executed a written Addendum (Addendum #1)—also prepared by Buyer's agent Niblo—intended to become part of the contract. Addendum #1 specified a modification to the terms of the closing date of the contract for an extension of the "due diligence" period by thirty days, extending the closing date from December 17, 2016, to January 17, 2017, and requiring Buyer to pay an additional $5000.00 of non-refundable earnest money in exchange for the modification.

On December 19, 2016, Niblo drafted a second written Addendum (Addendum #2) again changing the terms of the closing date and non-refundable earnest money for the extension. Addendum #2 stated, "Buyer agrees to pay $79,000 additional Non-Refundable Earnest Money to EXIT Realty-Midwest Trust

Account. Buyer and Seller agree to close on June 1, 2017," which was signed by the parties.

On May 31, 2017, Tofts had signed all of the closing documents, including the deed, and left the documents with the contract-designated closing agent at EXIT. EXIT owner Brad Sanderson directed employee Jessica Peterson to send electronic copies of all necessary closing documents to Samantha Sweet, an employee of Torstenson's attorney, Wilson, Guerrero, and Egge. Sanderson's email to Peterson noted: "We will need to include an overnight fee to get the deed and affidavit to them so they can e-file."

Shortly after, at 9:59 a.m. on May 31, Peterson sent copies of the following documents by e-mail to Sweet: the Buyer's Closing Statement, the Seller Closing Statement, the Warranty Deed, Affidavit in Aid of Title, the Real Estate Transfer—Declaration of Value, the Real Estate Transfer—Groundwater Hazard Statement, an invoice for the Abstract Continuation completed by Cornell Abstract Company, an invoice by Bjornstad Law Office for preparation of the Warranty Deed, tax parcel information, and the IRS form "Certification For No Information Reporting on the Sale/Exchange of a Principal Residence." At 10:01 a.m., Peterson sent an e-mail to Sweet with the wiring instructions including account numbers for Buyer to make payment.

On June 1, at 8:42 a.m., Sweet e-mailed Peterson, copying in Sanderson and real estate agent Tanner Perrigo, stating: "I am still waiting to hear back from the lender on this transaction. I have called this morning and left another message so I hope to hear back this morning yet." At 10:32 a.m., Sweet informed Sanderson by e-mail, "Ralph will be preparing the settlement statement and acting as

settlement agent himself. I gave him your info along with copies of the docs you sent me and the wire instructions for seller proceeds. He will be reaching out to you. Our office is no longer involved in the transaction."

Sanderson replied by e-mail at 10:47 a.m. with the question, "Who is Ralph?" and "If there is no closing company or attorney involved we will be handling the closing." At 10:48 a.m., Sweet responds, "Ralph is the lender at Northwest Bank."

At 11:24 a.m., Peterson emailed Sweet and Sanderson, copying Perrigo, "Would you please send me his email and phone number?"

At 3:13 p.m., Sanderson sent an e-mail to Ralph DiCesare, copying Tanner Perrigo, "Please send settlement statements to myself and closing agent above." DiCesare replied by email at 3:15 p.m., "Got the email. I will send out the settlement statement as soon as it is completed." His signature was followed by "Ag/Commercial Banker, VP, Northwest Bank."

On June 2 at 12:05 p.m., DiCesare e-mailed Sanderson, copying Perrigo and Sweet, stating, "Attached is the first shot at the Settlement Statement. Please let me know if anyone has any corrections."

On June 5, 2017, DiCesare sent an e-mail to numerous parties including Sweet and Sanderson with a revised Settlement Statement and also stating, "Attached is the corrected settlement statement (per the change in commissions from the original seller closing statement sent to me from EXIT) for the closing tomorrow.[3] Please let me know if there are any concerns or corrections." The

---

[3] The sellers did not agree to change the June 1 closing date.

settlement statement attached shows that, after the application of the earnest money, Buyer was required to pay $760,881.68 to satisfy the purchase price payment, of which $637,500.00 would be mortgaged with Northwest Bank.

On June 6 at 9:04 a.m., Sweet sent an e-mail to Sanderson, Peterson, and Perrigo and copying others: "I want to check one last time if original docs are going to be delivered to Ralph DiCesare with Northwest Bank today for closing. I know he was needing verification of a commission statement to correct the HUD and get approval from both sides." Sanderson replied to Sweet at 12:50 p.m., "As far as I know at this point it is the sellers['] intention not to close as the buyer has breached the June 1st closing date. I do believe there will be a letter to follow from sellers['] attorney."

Jeff Egge responded to Sanderson at 1:26 p.m., that Buyer "objects to and disputes the actions of the Sellers and considers their actions a breach of the purchase agreement."

On June 8, Buyer filed this suit for specific performance and monetary damages. The Sellers counterclaimed for breach of contract, receipt of the earnest money, and attorney fees per the contract.

A bench trial was held on July 31, 2018. The parties introduced exhibits and informed the trial court, "[W]e kind of look at this as kind of an extended summary judgment hearing. There's some depositions that have been taken. They have all been received into evidence. We aren't going to put those witnesses on again to restate what they have already said."

Sweet testified about the various people involved with the proposed purchase by Buyer. She stated was involved in "thousands" of closings working

for Wilson, Guerrero, and Egge. She estimated she worked on 2000 closings per year, about 500 of which were for Torstenson, and it was not uncommon for a closing not to occur on the closing date. Sweet also testified a cash sale did not mean the buyer would pay cash, but that the buyer did not have to prove it was qualified for financing. She also testified:

> Q. Now, [Ralph] DiCesare works for whom? A. Northwest Bank.
> Q. And your e-mail directed June 1st, 2017, 8:42, bottom of the page X-15 says, "I'm still waiting to hear back from the lender on this transaction." A. In regards to if we were going to act as settlement agent on his behalf, which we oftentimes do for lenders. Even though there's financing, we will still prepare settlement. Sometimes they prefer to do so.
> Q. Well, was Mr. Torstenson's financing complete? Did he have the money to write the check on June 1st, 2017? A. I can't confirm that.
> Q. Did you ever wire the money to either EXIT Realty or any closing agent for and on behalf of EXIT Realty? A. We would not have without approved settlement statements.
> Q. So you did not wire the money? A. No.
> Q. So you did not close June 1st, 2017? A. Correct.

Sweet also testified:

> Q. . . . . But other than you may have directed the funds or Mr. DiCesare may have directed that the funds not be disbursed, subject to approval of closing statement, there wasn't anything that prevented the funds from being wired? A. The lack of original transfer docs.
> Q. All right. And didn't it come to your attention at some date that Brad—that Mr. Sanderson was in possession of original documents, those documents which you have identified in Exhibit 10, the deed, the affidavits— A. I saw copies. I don't know who actually had possession of the originals.
> Q. All right. But there was no question that the originals existed? A. They did exist.
> . . . .
> Q. And in this case the documents that were drawn by Chayse Holdings here? A. Yes.
> Q. And when you—And you were aware of this closing from sometime in September of 2016 until June 1st, 2017? A. Yes.

Q. The Tofts appeared at the time of closing under the direction and supervision of Tanner Perrigo? A. Yes.

Q. And no money was received nor closing statement provided them different than that prepared by EXIT Realty? A. Correct.

Torstenson testified, "I do a lot of real estate—I buy land, develop land, sell land. So a lot of my business is in the real estate field." Torstenson testified he had purchased a home on Lake Okoboji for himself in 2015. He saw the Tofts' lot for sale while boating, and he directed Niblo of Chayse Holding Brokerage Services to prepare an offer to purchase the lot in the name of Chayse Holdings, LLC.

Torstenson testified he sought a due diligence extension of the December 17, 2016 closing date; "During the due diligence process, I was laying house plans out and determining buildable widths and buildable depths, just trying to figure out plans." When asked how he had planned to pay for the lot in December, Torsteson stated, "I was going to write a check" as he had $850,000 cash available. When asked why he did not close on January 17, 2017, Torstenson testified: "I wasn't done with my plans, so I went to another addendum that said I'll put another $79,000 down and close June 1." The addendum was agreed to by all parties in December. Torstenson was asked why he did not close on June 1, 2017. He responded, "I didn't have the seller docs to close." On cross-examination, Torstenson also acknowledged the property had not yet been sold and he could make a new offer to purchase.

The Buyer argued for specific performance of the contract. The Tofts argued they had entered into a signed contract, showed up on June 1 in

anticipation of performance, and the contract had been breached because no payment was made. They requested the earnest money be paid over to them.

The district court issued its written findings of fact, conclusions of law, and order. With respect to the Buyer's claims, the court found Buyer was not entitled to specific performance because (1) it breached the purchase agreement by not making payment on or before the closing date, (2) it was negligent in seeking financing in a timely manner, (3) it breached by attempting to unilaterally modify the contract terms. The court also found Buyer was not entitled to damages because it had failed to prove its performance of the contract terms.

With respect to the Tofts' counterclaim for breach of contract and damages, the court concluded the parties had mutually agreed that upon the Buyer's breach, the Tofts would recover the deposited earnest money held in trust by EXIT, which "contract provision equates to a liquidated damages contract clause" and was reasonable under the circumstances. The court also noted the contract provided for recovery of attorney fees upon the Tofts' application. The Buyer appeals.

**II. Scope of Review.**

Buyer argues our review should be de novo as the petition was filed in equity. However, the parties submitted the case as being ripe for summary judgment, which we review for errors at law. *See Jones v. Univ. of Iowa*, 836 N.W.2d 127, 139 (Iowa 2013). Moreover, we generally review the interpretation of a contract for correction of errors at law. *Hartig Drug Co. v. Hartig*, 602 N.W.2d 794, 797 (Iowa 1999).

**III. Discussion.**

The district court set out the relevant contract terms and facts of the case, thoroughly set out the law applicable to the claims and counterclaims, discussed the parties' positions, and resolved the issues in sellers' favor. We agree with the court that Buyer failed to establish it was ready and able to close on the date and time provided for in the contract.

> A cardinal rule of contract construction is that "time is of the essence." Where the parties set out a specific time for performance in the contract, they have made time of the essence. Our supreme court has held it grossly inequitable to require specific performance of a real estate contract where time is of the essence and "on the day fixed [the defendant] was ready and willing to perform, and was prevented from doing so by plaintiff's default." This is true even if the tender of money is made even one day late.

*High Dev. Corp. v. Star of the W. Co.*, No. 08-1245, 2009 WL 1676907, at *3 (Iowa Ct. App. Jun. 17, 2009) (citations omitted); *cf. SDG Macerich Props., L.P. v. Stanek Inc.*, 648 N.W.2d 581, 586 (Iowa 2002) ("Where the parties made time of the essence in setting a deadline for exercising an option, strict compliance is required."). Consequently, Buyer is not entitled to specific performance.

As set out above, the contract provides, "If Buyer fails to fulfill this agreement, all payments by Buyer may be forfeited and retained by Seller as provided in the Iowa law." The trial court observed the "Tofts extended or delayed closing for more than eight months during which time they forfeited the ability to sell the property and, in turn, lost out on business opportunities with the money from the sale [and] any investment interest."[4] The court continued,

---

[4] Greg and Gary Toft are farmers and had purchased this lakefront property because suitable farm land had not been for sale at the time. Gary Toft testified:

The parties agreed to include a clause providing to Tofts, upon breach by Chayse, an entitlement to all earnest money. The subsequent addendums reinforced this understanding between the parties that Chayse acknowledged the risk Tofts were taking in extending and delaying closing. For these reasons the amount of damages, under the circumstances, is not unreasonable, thus the provision is enforceable.

Finding no error, we affirm. *See* Iowa Ct. R. 21.26(1)(d), (e).

**AFFIRMED.**

---

We've had four farms that border ours come up for sale and we were crippled financially to bid on any of those farms, you know. I've got 160 acres. There was an 80 and an 80 and a 40 right next to us, and it crippled us from looking at those.